[Cite as *In re Mar.H.*, 2018-Ohio-883.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


In re Mar.H., Mal.H., M.Hi.            Court of Appeals Nos. L-17-1171

Trial Court No. JC 14241955


**DECISION AND JUDGMENT**

Decided: March 9, 2018

* * * * *

Laurel A. Kendall, for appellant.

Angela Y. Russell, for appellee.

* * * * *

**JENSEN, J.**

**{¶ 1}** This is an appeal from a judgment of the Juvenile Division of the Lucas County Court of Common Pleas awarding permanent custody of Mar. H., born March 15, 2008, ("Child One"); Mal. H., born October 23, 2009 ("Child Two"); and M.Hi., born August 14, 2012 ("Child Three") to Lucas County Children Services ("LCCS") and terminating the parental rights of the biological parents. For the reasons that follow, we affirm the decision of the trial court.

{¶ 2} E.M. is the biological mother of Child One, Child Two, and Child Three. L.H. is the biological father of Child One and Child Two. S.H. is the biological father of Child Three. Neither L.H. nor S. H. are parties to this appeal.

{¶ 3} This case originated when the court granted interim temporary custody of the children to LCCS on August 4, 2014. The day before, a neighbor had reported that Child Three was outside, alone, with a "soaking" diaper. When the police responded to the call, they found all three children near the home, alone. In the opinion of an LCCS caseworker who accompanied the officers to check on the welfare of the children, the family home was in "deplorable condition." It was a Sunday morning. The children reported that their mother had not been home since Wednesday.

{¶ 4} The juvenile court adjudicated the children as neglected. A case plan with a goal of reunification was filed August 15, 2014. Various services were recommended to mother. On August 3, 2015, an extension of temporary custody was granted. The trial court found that LCCS had made reasonable efforts to finalize a permanency plan. On December 3, 2015, the children were placed in the legal custody of mother, with protective supervision awarded to LCCS until further order of the court.

{¶ 5} On May 25, 2016, Child One, then eight years old, told the assistant principal at his elementary school that he wanted to drown himself. The assistant principal invited Child One to her office and spoke with him "extensively" about his feelings and home life. Child One indicated that he was often unhappy and afraid. Child One further indicated that when his mother left at night he was responsible for watching Child Two and Child Three. Child One told the assistant principal that the family had

2.

very little food in the home and that he was hungry. The assistant principal called LCCS to report what she had learned. LCCS Caseworkers went to the school to interview Child One and Child Two. The assistant principal also called mother and informed her that Child One had made a statement about harming himself. The assistant principal suggested to mother that she take Child One to the rescue crises center for evaluation. There is no evidence that mother followed through with the assistant principal's suggestion.

{¶ 6} On May 26, 2016, a motion to change disposition was filed. A shelter care hearing was held and interim temporary custody awarded to LCCS.

{¶ 7} On July 20, 2016, an amended case plan with a goal of reunification was filed. The coversheet indicates that LCCS provided mother with a copy of the plan "at the time that it was filed at court."

{¶ 8} An "ADMINISTRATIVE REVIEW" of the case plan was filed August 2, 2016. The coversheet indicates that LCCS provided mother with a copy of the document "at the time that it was filed at court." The review indicates that mother was making insufficient progress towards addressing her use of alcohol, insufficient progress toward addressing the issues of neglect, some progress towards addressing the cleanliness of the home, and some progress toward addressing her mental health issues. The review indicates that despite LCCS recommendations that Child One and Child Two attend counseling services, mother failed to get the children to their appointment in March of 2016. It was further reported that because of school and transportation issues mother indicated that there was "not a good enough day" for the children to attend counseling.

3.

**{¶ 9}** On October 24, 2016, LCCS filed a motion for permanent custody. In its motion, LCCS alleged that after mother was reunited with the children in December 2015, she failed to reengage in the recommended services for substance abuse treatment, the family's housing conditions deteriorated, and mother failed to take the children to the recommended counseling services. The motion further alleged that after the children were removed from the mother in May 2016, mother failed to complete case plan services to address her "parenting deficits." It further alleged that mother had been diagnosed with a mental health condition but that she failed to take medication as prescribed, had missed several medical appointments, and had failed to engage in the recommended counseling services. A disposition hearing was conducted over several days in April and May, 2017. The following evidence was produced at the hearing.

**{¶ 10}** Sherrie Twining is employed by LCCS as an emergency services assessment worker. Ms. Twining described, in detail, the circumstances under which this case began: the children, then ages 6, 4, and 1, were found walking the neighborhood, "very dirty" and unsupervised on August 3, 2014. Garbage was "laying everywhere" inside the family home. While trying to make contact with mother, Twining discovered that the children had been left unsupervised before. The children were arrested for safekeeping and taken to LCCS.

**{¶ 11}** Kim Casdorph is a caseworker with LCCS. Ms. Casdorph testified that LCCS held temporary custody of the children from August 2014 through December 2015 and then again from May 2016 through the May 2017 hearing. During the interim period mother held custody of the children while LCCS had protective supervision.

4.

{¶ 12} Ms. Casdorph explained that she was first assigned to the family in August 2014. She indicated that the children were initially removed from mother's custody because of the conditions of the home and lack of supervision. Mother's first case plan addressed both of these concerns.

{¶ 13} On September 18, 2014, mother was arrested for disorderly conduct. Because mother was intoxicated at the time of the arrest, LCCS added substance abuse services to her case plan.

{¶ 14} By the end of October 2014, mother had participated in the recommended mental health assessment. She was diagnosed with post-traumatic stress disorder. Mental health services were added to her case plan. Mother engaged in dual program for substance abuse and mental health services at A Renewed Mind. By the end of 2014, however, mother's insurance lapsed and she could no longer attend services there. In February 2015, mother engaged in substance abuse and mental health services at New Concepts. At first, mother made progress. However, because mother's phone wasn't always on, she missed transportation opportunities provided to her by the service provider. By May of 2015, mother was discharged from New Concepts as unsuccessful. A short time later, mother engaged in mental health, substance abuse and medication management services at Unison. Mother successfully completed an intensive outpatient substance abuse treatment service in October 2015.

{¶ 15} In regard to parenting services, Ms. Casdorph explained that in May 2015, mother and Child Two began parent-child interactive therapy to help mother address

5.

Child Two's behavioral issues (defiance, testing the limits, acting out). In Ms. Casdorph's opinion, when mother attended the interactive therapy, she did well and was open and receptive to the therapist's suggestions. In addition to the interactive therapy, LCCS linked mother with a parent advocate, a community advocate, and a visit coach.

{¶ 16} In December 2015, the children were reunited with mother. Mother was allowed to take a few weeks off from her services at Unison. After the holidays, mother failed to reengage with her service provider. In mid-January 2016, Ms. Casdorph, mother, and mother's Unison service provider met to discuss a plan to get mother "back on track." Mother did not follow through with the plan and was discharged from Unison's dual substance abuse and mental health "aftercare program" as unsuccessful. When Ms. Casdorph informed mother that she needed to reengage in the aftercare program, mother indicated to Ms. Casdorph that she never thought she needed substance abuse services.

{¶ 17} Ms. Casdorph testified that early on, mother reported that the fathers of her children had both committed domestic violence against her. In fact, one of the father's once hit mother so hard that she lost vision in one eye. Mother completed domestic violence services by early 2015. However, after reunification with their mother, the children reported that domestic violence and "raised voices" were still present in the home.

{¶ 18} In regard to the goal of "maintaining the home," Ms. Casdorph testified that progress was "very slow going." Prior to reunification, LCCS bought a set of bunk

6.

beds and a twin bed for the boy's room and all the boys' toys were put away. After reunification, the condition of the boys' room started to decline. Ms. Casdorph testified:

> The boys room, the beds were broken. There was stuff all over the floor. At times you couldn't really walk through without walking on things. There was a time that there was dishes in the kitchen that were sitting there and dirty. There were gnats in the kitchen. There was a time when there was cereal on the floor, dry cereal. There were times when I went over and it was – there was food that had gotten from the pantry that was on the floor and the boys were just walking over it, walking on it. So it started to decline.

{¶ 19} In regard to parenting, Ms. Casdorph indicated that mother "stuggled." She explained:

> Just like I said, she would send them all – she would send Child One and Child Two to the room to clean up the room and they, as she reported, would either start playing or fight, just not make progress. We discussed different ways to address that, for her to actually go in there and be with them while they do it. She said she tried that one and it didn't work. There – they would fight with her about whether or not they were doing their homework. She would – one time I was at the house and the boys were in the room fighting. She went to get them out of the room and put them in time out and the TV was always on in the house. So she had Child One in one corner in the living room and Child Two was watching television while

7.

he was standing in the corner and Child One was having a fit, and she said, why can't you be more like [Child Two], he's doing it the right way standing in time out. So we discussed that about, you know, ways to not compare the boys and to have their punishments be equal. The – the boys would challenge her a lot. She would become frustrated at times with them.

Despite her parenting flaws, Ms. Casdorph indicated that both before and after reunification, mother was consistent with her visits with the children.

{¶ 20} In regard to the children's case plans, Ms. Casdorph testified that prior to reunification, Child One and Child Two were participating in counseling at Harbor, Child Three was linked with Help Me Grow and early intervention services. In October 2015, Child One and Child Two transitioned out of Harbor and started receiving behavior modification services in their classroom at Keyser Elementary School. When mother was reunited with the children in December 2015, mother scheduled but failed to keep an intake appointment for Child One and Child Two at A Renewed Mind.

{¶ 21} In January 2016, Ms. Casdorph informed mother that the children needed to get back into counseling but mother was indecisive about where she wanted to take the boys for services. Eventually, Ms. Casdorph successfully encouraged mother to enroll Child One and Child Two in the "Tackle" program at Riverside Elementary School.

{¶ 22} After the children were removed from mother in May 2016, the first foster family kept the children enrolled at Riverside Elementary School. They continued in the

8.

Tackle program. When the children began having difficulties with the first foster family, they were transferred to a second foster family outside of Lucas County. There the children began receiving services at Adriel.

{¶ 23} Ms. Casdorph testified that LCCS seeks permanent custody of the children because "[t]he agency has been working with the family for a long time." She explained that while mother has made progress in some areas, "there's always a time where progress stops with her."

{¶ 24} Joy Fruchey is a foster care and adoption therapist. In October 2016, Ms. Fruchey performed an assessment on the children. Ms. Fruchey diagnosed Child One and Child Two with post-traumatic stress disorder, acute. In regard to Child Three, Ms. Fruchey diagnosed him with post-traumatic stress disorder, unspecified. In her opinion, Child Three was aware that a trauma had occurred but was not as familiar with the details as the older boys. Ms. Fruchey testified that a safe, structured, warm and nurturing environment was necessary to improve the mental health of all three children.

{¶ 25} Pebble Spencer is a volunteer in the parent advocate program at LCCS. Early in the case, Ms. Spencer provided "moral support" for mother both over the telephone and in person. In December of 2015, Ms. Spencer went to the family's home to provide support to mother. Child One was outside the apartment with some other children. When Ms. Spencer knocked on the apartment door, Child Two answered. Mother was not at home. Ms. Spencer attempted to contact mother by phone "several

9.

times" over the course of 15-20 minutes.  Mother did not answer her phone.  Before leaving the apartment, Ms. Spencer called the LCCS caseworker and reported that the children appeared to be home alone.

{¶ 26} Scott Bieniek is an AOD therapist at Unison Health Group.  Mr. Bieniek first came into contact with mother on July 29, 2015. During the initial assessment, mother was diagnosed with alcohol use disorder moderate, cannabis abuse disorder mild, and major depression recurrent mild.  Mr. Bieniek recommended that mother enter into a dual diagnosis program.  Treatment required intensive outpatient treatment three times a week for six weeks, three Alcoholics Anonymous meetings a week, and weekly therapy sessions with Mr. Bieniek.  Mother successfully completed the intensive outpatient treatment on October 19, 2015.

{¶ 27} In order to achieve long-term sobriety, Mr. Bieniek recommended that mother participate in Unison's "aftercare" program.  Aftercare included 1.5 hour sessions twice a week for 12 weeks, three Alcoholics Anonymous meetings per week, random drug screens, and weekly sessions with Mr. Bieniek.  At trial, Mr. Bieniek explained that the aftercare program is important because the material presented is "critical to both maintaining and continuing with long-term sobriety."  Soon after mother began the aftercare program, her attendance became "very sporadic."  She only attended group once a week and missed several individual therapy sessions with Mr. Bieniek.  On February 29, 2016, Mr. Bieniek terminated mother from the aftercare services for "not complying with treatment recommendations."

10.

{¶ 28} Lynn Pinkelman is employed by LCCS as an assessment specialist. Ms. Pinkelman first began her involvement with the family on May 25, 2016. She explained that LCCS had received a referral from Riverside Elementary School that Child One was making statements that he wanted to harm himself, that the children were being left home alone, and that there was no food in the home.

{¶ 29} Upon receiving the referral, Ms. Pinkelman went to the school to interview Child One and Child Two (both the school principal and the ongoing caseworker were present during the interviews). Both Child One and Child Two expressed concerns for domestic violence in the home, for being home alone, for walking to school alone, and for taking the TARTA bus by themselves. The children indicated that they had very little food in the home. A "staffing" was held later that day. Mother participated by telephone. During the staffing mother acknowledged her history of substance abuse and acknowledged that she had been drinking. In regard to supervision, mother admitted that on one occasion Child One and Child Two walked to school by themselves and that on one occasion, Child One and Child Two took the TARTA bus to school by themselves.

{¶ 30} Toledo Police Officer William Clark testified that early in the morning of January 1, 2017, he responded to a call for a "domestic argument" at mother's apartment. When he arrived, he could hear arguing from inside the apartment. When the officer knocked on the door, mother and K.J. both came to the door. Officer Clark indicated that both mother and K.J. displayed "visible signs of intoxication" and both admitted to having "some alcoholic beverages."

11.

**{¶ 31}** Erica Walker is a clinical therapist at Unison Behavior Health. Ms. Walker testified that mother began treating with her in December 2016. At that time, Mother was diagnosed with major depressive disorder and post-traumatic stress disorder. Mother usually meet with Ms. Walker twice a month, but missed a number of appointments. Ms. Walker indicated that when mother began treatment she was "tearful." When asked whether mother was improving, Ms. Walker indicated that mother remained tearful during their sessions. Ms. Walker testified that mother reported having low motivation, and that her low motivation sometimes interfered with things she wanted to do.

**{¶ 32}** Mother testified about the programs she participated in and the relationship with her children. Mother asserted that prior to the children's August 2014 removal, her home was not always clean because she was depressed, single, and the mother of three small children. She indicated that at the time of the hearing, she was on medication and learning how to cope with not being happy every day. Mother further indicated that she was learning how to deal with the children and their behaviors. She stated, "[m]y main focus is for my kids to come home, for me to get a job and just be a mother."

**{¶ 33}** Diane May is the CASA assigned to the case. Ms. May testified that in her opinion mother had "trouble with phones, communication, [and] transportation." She also believed that throughout the case mother was depressed, overwhelmed, and not very compliant. Nonetheless, Ms. May indicated that mother loves the children and tries to be a good parent to them. When asked for her recommendation, Ms. May stated, "I would like to see the boys go back to mom with a strict case plan, a gradual move. I really think she deserves another chance."

12.

{¶ 34} By judgment entry filed June 19, 2017, the trial court granted LCCS's motion for permanent custody. Mother now appeals and asserts two assignments of error for review:

> I. The trial court erred in granting appellee Lucas County Children Services motion for permanent custody as against the manifest weight of the evidence when there was no investigation by the agency to confirm the alleged conditions for a removal on May 25, 2016.

> II. The agency did not make reasonable efforts to reunify the family when mother was not offered a case plan after the second removal, and the agency refused permission for the children to take prescribed medications, against medical recommendation, thus creating additional hurdles to reunification pursuant to R.C. 2151.419.

**First Assignment of Error**

{¶ 35} Under certain circumstances, a trial court can award permanent custody to a public children's services agency upon finding that the child "cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents," so long as the court also determines that the award of permanent custody is in the child's best interests. R.C. 2151.414(B)(1).

{¶ 36} Under R.C. 2151.414(E), a finding, by clear and convincing evidence, that one of the conditions listed in R.C. 2151.414(E)(1)-(16) exists is necessary to establish that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738,

13.

syllabus. In turn, R.C. 2151.414 (D) lists relevant factors to be considered by the court in determining whether an award of permanent custody to a public children's services agency is in the best interest of the child.

{¶ 37} Clear and convincing evidence is evidence that what will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 38} Here, the trial court made several findings under the conditions listed in R.C. 2151.414(E). First, under R.C. 2151.414(E)(1), the trial court held that mother "has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the children's home."

{¶ 39} R.C. 2151.414(E)(1) states:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and

rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 40} Initially, the children were placed in the care and custody of LCCS because of concerns about "poor supervision, deplorable housing conditions and substance abuse." Shortly thereafter, it became clear that mother had been involved in a violent domestic relationship and had some mental health issues. Mother was offered case plan services to address all of these concerns.

{¶ 41} The LCCS caseworker testified, "when the case was first opened, it seemed really promising. * * * [mother] has done multiple services, gone multiple places and made progress and done well but then there's always a time where it gets hard or there is something in the way and she stops attending."

{¶ 42} LCCS introduced evidence that after the children were first returned to mother she had a hard time keeping the home clean, keeping food in the pantry, and providing adequate transportation and supervision for the children. Mother started substance abuse services, but discontinued the services when she determined that she never needed it in the first place.

{¶ 43} This evidence is sufficient to support the trial court's finding relating to mother's failure to remedy the conditions which caused the children to be placed outside the home.

15.

**{¶ 44}** Second, under R.C. 2151.414(E)(2), the trial court held that mother's chronic mental illness "is so severe" that it makes her "unable to provide an adequate permanent home for the children at the present time and, as anticipated, within one year after this permanent custody hearing." R.C. 2151.414(E)(2) allows a court to consider:

> Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code.

**{¶ 45}** LCCS presented evidence that mother was diagnosed with major depressive disorder, recurrent; post-traumatic stress disorder; and generalized anxiety disorder. Despite being recommend for individual counseling to address her depression and anxiety, mother's participation was inconsistent. She missed or cancelled several individual counseling and medication appointments. This evidence is sufficient to support the trial court's finding.

**{¶ 46}** This court has previously explained that "the existence of only one of the factors under R.C. 2151.414(E) is sufficient to determine that a child cannot be placed with a parent within a reasonable time." *In re S.P.,* 6th Dist. Lucas No. L-14-1113, 2014-Ohio-5075, ¶ 32, quoting *In re R.L.*, 9th Dist. Summit Nos. 27214, 27233, 2014-Ohio-

16.

3117, ¶ 24. Upon review of the evidence, we find that the record contains competent, credible evidence supporting the trial court's conclusions that one or more of the factors enumerated in R.C. 2151.414(E) exist.

{¶ 47} As set forth above, when determining whether a grant of permanent custody is in a child's best interest, the trial court "must consider all the relevant factors, including those enumerated in R.C. 2151.414(D): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence in his life, and any applicability of the factors in R.C. 2151.414(E)(7) to (11)." *In re E.M.*, 9th Dist Wayne No. 15CA0033, 2015-Ohio-5316, ¶ 13.

{¶ 48} Here, the trial court found that it is in the best interest of the child to award permanent custody to LCCS because the "children are in need of permanency." In its decision, the court noted that while the CASA assigned to this case recommended a grant of legal custody to mother with an award of protective supervision to LCCS, an award of legal custody with protective supervision is "outside of the statutory framework in that it exceeds the two years of agency involvement contemplated by the statute." The court further noted that "the children have had two removals from the family home and that legal custody with protective supervision has already been attempted and failed."

{¶ 49} After reviewing the evidence, we conclude that the decision of the trial court to award of permanent custody of Child One, Child Two, and Child Three to LCCS was supported by clear and convincing evidence. Accordingly, mother's first assignment of error is not well taken.

17.

## Second Assignment of Error

{¶ 50} In her second assignment of error, mother contends that after LCCS removed the children from mother's care the second time, LCCS failed to make reasonable efforts to reunify the family as required by R.C. 2151.419. In support of this assignment, mother alleges: (1) the mother was not given a case plan after the second removal, and (2) LCCS's decision to withhold medicine prescribed by a physician to treat psychiatric issues was "unlawful" and "completely inappropriate."

{¶ 51} Preliminarily, we note that the Supreme Court of Ohio has held that the reasonable-efforts requirement set forth in R.C. 2151.419 does not apply to "motions for permanent custody brought pursuant to R.C. 2151.413, or to hearing held on such motions pursuant to R.C. 2151.414." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 41, quoting *In re A.C.*, 2004-Ohio-5531, ¶30. Rather, it applies "only at hearings held pursuant to R.C. 2151.28, 2151.31(E), 2151.314, 2151.33 or 2151.353." *Id*. However, "except for some narrowly defined statutory exceptions, the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights." *Id.* at 43. "If the agency has not established the reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.*

{¶ 52} Here, LCCS was first awarded emergency custody of the children on August 3, 2014. A case plan with a goal of reunification was filed and approved. It is clear that during the child-custody proceedings prior to the termination of parental rights, LCCS did make reasonable efforts to reunify the family. In fact, mother was awarded

18.

legal custody of the children (with protective supervision) on December 3, 2015, 15 months after the initial removal. At that time, the trial court made the following findings in regard to mother's progress: "[Mother] has success. Completed [domestic violence] and continues in her substance abuse [treatment]. And has made [progress] in maintaining her housing [appropriately]. Children just had to change [mental health] providers. [Mother] completed parenting and will begin PCIT at Harbor with the children."

{¶ 53} The next question before the court, therefore, concerns mother's allegation that she was not given a case plan after the "second removal" on May 25, 2016. This is untrue. Throughout LCCS's involvement with the family, mother had various case plans describing, in detail, the family members' needs and necessary services. On July 20, 2016, within 60 days of the second removal, an amended case plan was filed with the court. Subsequent case plans were filed August 2, 2016, and August 26, 2016. Thus, we find no merit in appellant's argument in this regard.

{¶ 54} As to appellant's argument that "LCCS's decision to withhold medicine prescribed by a physician to treat psychiatric issues was 'unlawful' and 'completely inappropriate,'" we disagree. The LCCS caseworker testified that "the agency typically doesn't start two medications at once for a child who has never been on psychotropic medication for fear of side effects." While she admitted that it was often a lengthy process, the LCCS supervisor and executive director make the decisions regarding medication of the children under LCCS care. There is no indication that LCCS's decision to withhold medication effected mother's failure to remedy the conditions which

19.

caused the children to be placed outside the home. Thus, we find no merit in appellant's argument in this regard. Accordingly, appellant's second assignment of error is not well-taken.

## Conclusion

{¶ 55} On consideration, the judgment of the Lucas County Court of Common Pleas, Juvenile Division is affirmed.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.

_____
JUDGE

James D. Jensen, J.

Christine E. Mayle, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE