[Cite as *In re G.P.*, 2018-Ohio-4584.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re G.P., C.G.

Court of Appeals No.   L-18-1126
L-18-1130
L-18-1132

Trial Court No. JC 16253862

**DECISION AND JUDGMENT**

Decided:  November 14, 2018

* * * * *

Melody R. Wilhelm, for appellant, W.G.

Laurel A. Kendall, for appellant, K.P.

Jeremy G. Young, for appellee.

* * * * *

**MAYLE, P.J.**

**{¶ 1}** In this consolidated appeal, appellants, K.P. ("mother") and W.G. ("father"), appeal the May 17, 2018 judgment of the Lucas County Court of Common Pleas,

Juvenile Division, terminating their parental rights and granting permanent custody of their children, G.P. and C.G. ("the children"), to appellee, Lucas County Children Services ("LCCS"). For the following reasons, we affirm.

## I. Background and Facts

### A. The Family's Involvement with LCCS

{¶ 2} On February 22, 2016, LCCS received two referrals alleging that both parents were "heavily into drugs;" mother was using heroin and meth; mother was being evicted from her home; mother had contacted relatives because she could not care for the parents' four children;[1] mother and father had a long history of domestic violence against each other; and the odors of sulfur and ammonia were coming from mother's home.

{¶ 3} LCCS sent a caseworker to mother's home to investigate the referrals. Mother would not allow the caseworker into the home, but the caseworker could smell a "chemical odor" from the outside. At the caseworker's request, mother agreed to submit to a drug screen, which came back positive for marijuana.

{¶ 4} Three days later, the caseworker returned to the home, and mother allowed her to see G.P., but not C.G., who was with father. The caseworker noticed a "huge" hand-shaped red mark on G.P.'s face. Mother claimed that the mark came from G.P. crawling into a hole in one of the walls in her house, but the caseworker did not believe that G.P. could have gotten into the hole. With the caseworker's assistance, mother

---

[1] The parents have four children together. Mother voluntarily placed two of the children with a maternal relative, so they are not involved in this case.

2.

attempted to find a placement for G.P. When she was unsuccessful, LCCS sought and obtained emergency custody of G.P. later that day; the agency was unable to locate C.G. at that time.

{¶ 5} At a family case conference on February 29, 2016, mother told the investigating caseworker that she had been diagnosed with bipolar disorder, for which she was taking medicine but not receiving other treatment. Mother could not produce her medicine for the caseworker, however. Mother confirmed that she was being evicted from her home. She also disclosed that she was on probation and had active warrants in Michigan. Additionally, mother claimed that father had been violent with her and had shown her how to inject herself with drugs. She also said that father was dealing cocaine and had active warrants in Michigan, both of which father denied. Both parents denied using drugs other than marijuana. Despite mother's denial of drug use, the caseworker claimed that mother told her on two separate days that "You guys are going to make me shoot up my heroin."

{¶ 6} The next day, LCCS filed a complaint in dependency and neglect. After a shelter care hearing, a magistrate awarded LCCS interim temporary custody of the children.

{¶ 7} Following a contested adjudicatory hearing, the magistrate determined that the children were dependent and continued interim temporary custody with LCCS. The trial court adopted the magistrate's decision.

3.

**{¶ 8}** After the dispositional hearing, the magistrate determined that it was in the children's best interest to award LCCS temporary custody. The trial court also adopted this decision.

**{¶ 9}** On February 21, 2018, LCCS filed a motion for permanent custody of the children. LCCS alleged that the children could not or should not be placed with either parent in a reasonable amount of time, the children had been in LCCS's custody for more than 12 months of a consecutive 22-month period, and permanent custody was in the children's best interest because neither parent had made substantial progress on the case plan.[2] According to LCCS, the family's case plan required father to complete a substance abuse assessment and "complete parenting." The agency alleged that father was uninvolved, had not visited the children, and had not maintained contact with the caseworker, the GAL, or the court, so he was removed from the case plan.

**{¶ 10}** As to mother, the case plan required her to complete a dual-diagnosis assessment and follow any treatment recommendations, complete domestic violence services, and obtain a parenting assessment and follow any recommendations. LCCS alleged that mother's whereabouts were unknown from August 2016 to August 2017; mother did not complete her dual-diagnosis assessment until August 2017; mother received treatment recommendations, but was discharged from treatment for noncompliance; mother did not visit the children from August 2016 to August 2017; and

---

[2] The docket shows that 17 case plans were filed with the trial court between March 2016 and the permanent custody hearing. The only case plans in the record, however, are the ones filed on February 5 and March 22, 2018.

4.

LCCS suspended mother's visits because she threatened to "whoop [G.P.'s] ass" during a supervised visit and threatened the children's foster parent after claiming that she saw marks on the children.

**B. The Permanent Custody Hearing**

{¶ 11} On May 1, 2018, the trial court held a hearing on the motion for permanent custody. Although both mother and father were given notice of the hearing, neither appeared. Counsel for mother told the court that he expected mother to be at the hearing and had been unsuccessful at contacting her that morning. Regardless, counsel knew her wishes and was prepared to proceed with the hearing. Counsel for father told the court that he had little contact with father over the course of the case, but had received a letter from father in February 2018 in which father stated that he did not want to permanently lose custody of the children. Counsel also said that father was serving a prison sentence of 30 to 120 months in Michigan. Even though mother and father were not at the hearing, counsel for both parents participated in the hearing and cross-examined LCCS's witnesses. LCCS called only the family's case worker, Jenny Monroe-Wells, and the children's guardian ad litem ("GAL").

{¶ 12} Monroe-Wells testified that the family came to LCCS's attention when the agency received reports that mother was using drugs and being evicted from her home, father was using drugs, and there had been domestic violence between mother and father. LCCS removed the children from mother's custody when the investigative caseworker

5.

saw that G.P. had a red mark on his face that looked like a handprint and mother provided an implausible explanation for the mark.

{¶ 13} After LCCS took custody of the children, the agency created a case plan for the family with the goal of reunification. Neither parent successfully completed the requirements of the case plan.

{¶ 14} Regarding father, Monroe-Wells testified that LCCS referred him to substance abuse and mental health treatment and parenting classes. Although father visited the children until July 22, 2016, he did not participate in any other case plan services. Father had no contact with the agency after July 2016, and LCCS eventually removed him from the case plan because of his lack of participation.

{¶ 15} Monroe-Wells said that father was removed from the case plan before she became the family's caseworker, so she had never met with or spoken to father. She did, however, send quarterly search letters to him at his last known addresses. Monroe-Wells eventually learned from a maternal relative that father was imprisoned in Michigan on a 30 to 120 month drug sentence.

{¶ 16} The GAL testified that father was very good with the children and the children and father were affectionate toward each other. Like LCCS, the GAL had not had any contact with father since his final visit with the children on July 22, 2016. When the GAL learned that father was incarcerated, she sent him a letter, but he did not respond. To the best of the GAL's knowledge, the only contact that father had with the children after the final visit was a phone call in February or March 2018 when father

6.

called a paternal relative's home and spoke to the children while they were visiting the relative.

{¶ 17} As to mother, the case plan initially required her to obtain mental health and parenting services. In November 2017, LCCS added domestic violence services to mother's case plan because mother disclosed that her current boyfriend had assaulted her and thrown a brick at her car. In March 2018, LCCS learned that the boyfriend punched mother in the face during an argument. However, mother and the boyfriend both denied that the incident happened. Although criminal charges were filed against the boyfriend, they were dismissed because mother refused to cooperate with the prosecution. The GAL echoed LCCS's concerns about mother's boyfriend. According to the GAL, mother said that the boyfriend caused mother to miscarry a pregnancy by kicking or punching mother in the stomach. Mother later denied the incident. The boyfriend "also has an extensive criminal history, lots of charges for assaults and domestic violence that are almost always dismissed." Monroe-Wells and the GAL both believed that mother was still in a relationship with the boyfriend at the time of the hearing.

{¶ 18} To address mother's mental health issues, LCCS referred her for a dual-diagnosis assessment. Mother completed an assessment at Unison in February 2016. Unison diagnosed her with major depressive disorder, generalized anxiety disorder, and attention deficit disorder and recommended therapy and psychiatric services. Mother declined therapy, but initially agreed to psychiatric treatment. She did not successfully complete her treatment at Unison, however. According to Monroe-Wells, mother

7.

stopped treating at Unison because "[s]he did not agree with the medications that they were trying on her, and said that she felt, quote, 'like a guinea pig.'"

{¶ 19} In April 2017, Monroe-Wells referred mother to A Renewed Mind for a second assessment. Mother completed the assessment in August 2017. A Renewed Mind diagnosed her with major depressive disorder and generalized anxiety disorder and recommended counseling and psychiatric services. Mother engaged in services at A Renewed Mind, but had not successfully completed treatment at the time of the hearing. About a week before the hearing, Monroe-Wells spoke to mother's counselor and learned that mother attended a counseling appointment approximately a month before the hearing, but had not scheduled any other appointments.

{¶ 20} Monroe-Wells said that she was unable to refer mother for a parenting assessment or domestic violence services because mother was not making any progress with her mental health treatment.

{¶ 21} Monroe-Wells testified (and the GAL's report confirmed) that mother inconsistently visited the children; according to the GAL's report, mother attended only six of 39 visits from March 2016 to January 2017. The GAL believed that mother loved the children, but she had trouble controlling them and their behaviors. And although mother tried to play and engage with the children, she was not very affectionate with them. On cross-examination, the GAL admitted that she and mother did not always get along and that mother would likely say that the GAL was "probably not telling the truth on a lot of things."

8.

{¶ 22} Mother's irregular visits, combined with the escalation of the children's behavioral problems after seeing mother, led LCCS to suspend mother's visits in 2016. Monroe-Wells said that mother had no contact with the agency from the time her visits were suspended until April 2017, when mother asked to resume visits. The GAL recalled that mother said that she stopped visiting because she was homeless and she did not want the children to see her in that state.

{¶ 23} LCCS reinstated mother's visits with the children in October 2017, but suspended the visits again in December 2017 because of mother's behavior. During a visit on November 11, mother chased G.P. around a table shouting that she would "whip [his] ass" because of his behavior. At the visit on November 29—which was mother's last visit with the children—mother became upset because she claimed that G.P. had some scratches and C.G. had a black eye. She reported this to the security guard on duty, spoke to a caseworker, and requested that police go to the foster home to check on the children. Both the police officer who conducted a welfare check on the children after the visit and the caseworker on duty checked the children, but did not find any injuries.

{¶ 24} At the end of the visit, mother encountered the children's foster parent in his car. When LCCS questioned mother about the incident, she reported that she yelled at the foster parent "not to hit the kids," and that the foster parent responded by swearing at her and speeding off. In contrast, the foster parent reported to LCCS that mother "yelled something about don't hit my kids" and threw a pizza at the foster parent's car as he was leaving.

9.

{¶ 25} Several days later, mother came to LCCS to speak to Monroe-Wells about the November 29 visit. Monroe-Wells testified that mother was agitated—she yelled, swore, and threatened to "fucking kill" the foster parent—and because mother's behavior "continued to escalate," Monroe-Wells had a security guard escort mother from the building. This incident prompted LCCS to suspend mother's visits again. When mother asked to reinstate visits, Monroe-Wells told mother that she needed to comply with her mental health treatment before LCCS would allow her to visit the children.

{¶ 26} Concerning the children, Monroe-Wells and the GAL both reported that they have behavioral problems that have disrupted their placements and gotten them expelled by daycare providers. Monroe-Wells said that the children are physically aggressive to other children and adults, destroy property, spit on people, use foul language, threaten to hurt others, and try to sneak out of the house. The GAL described the children's behaviors as "little boy behaviors, but they're more extreme than normal." The children were engaged in counseling to address their post-traumatic stress and problematic behaviors. LCCS was also in the process of getting them psychological evaluations because of their continuing behaviors and their complete lack of empathy.

{¶ 27} At the time of the hearing, the children were placed with a paternal relative, K.C., who wanted to adopt them. K.C.'s home was the children's fourth placement in two years. Monroe-Wells said that K.C. was very nurturing, very patient, appropriately disciplined the children when they misbehaved, and provided the "extensive one-on-one attention" that the children needed. The GAL agreed, saying that K.C. had "pretty much

10.

devoted her life to those two boys" and that the children "probably have the best life now that they've ever had * * *." For example, K.C. enrolled the children in sports, held a joint birthday party for them, and coordinated contact between them and their siblings who are in the custody of a different relative. K.C. and the children have bonded, and the children told the GAL that they want to live with K.C.

{¶ 28} Monroe-Wells and the GAL both recommended that the court grant LCCS permanent custody of the children. Monroe-Wells believed that awarding LCCS permanent custody of the children was in the children's best interest. She said that the children deserve a permanent, stable home where their needs and safety would be addressed. She believed that mother had not addressed the concerns that LCCS initially identified, even though mother had housing (which Monroe-Wells had seen from the outside, but had not been inside), consistently tested negative for drugs after her initial drug screen, and had some income from donating plasma twice a week. Monroe-Wells thought that mother's lack of commitment to stabilizing her mental health and lack of employment would leave mother unable to handle the children's needs and behaviors.

{¶ 29} Likewise, the GAL believed that awarding LCCS permanent custody of the children was in their best interest. She did not believe that mother could manage the children and their behaviors in addition to managing her own mental health issues. The children needed stability, nurturing, and consistency that neither parent was currently able to provide. They also needed a caregiver who would take them to their appointments and follow their providers' recommendations. The GAL also noted that the

11.

children had been out of the parents' custody since the beginning of the case—nearly 26 months.

{¶ 30} After deliberating, the trial court found that LCCS met its burden of proof by clear and convincing evidence. It determined that LCCS had made reasonable efforts to prevent the children's continued removal from the parents, but despite the agency's efforts, the children could not and should not be returned to the parents. The court noted that the factors in R.C. 2151.414(E)(1), (2), and (4) applied to mother and the factors in (E)(1), (10), and (11) applied to father. The court also found that granting permanent custody to LCCS was in the children's best interest because "[t]hey are in need of a stable, consistent, forever home. And this can only be accomplished by the granting of permanent custody."

## C. The Trial Court's Decision

{¶ 31} In its judgment entry, the trial court terminated mother's and father's parental rights and awarded permanent custody of the children to LCCS for adoptive placement and planning. In doing so, the court found by clear and convincing evidence that the children could not be placed with either parent within a reasonable time and should not be placed with either parent and that awarding permanent custody to LCCS was in the children's best interest. In determining that the children could not and should not be placed with the parents, the court made findings pursuant to R.C. 2151.414 (E)(1), (2), (4), (10), and (12).

12.

**{¶ 32}** As to (E)(1), the court found that that the parents continuously and repeatedly failed to substantially remedy the conditions that caused the children to be placed outside of the home, despite reasonable case planning and diligent efforts by LCCS. Father failed to participate in case plan services, and LCCS removed him from the case plan in 2016 after he stopped contacting the agency and the children. Mother initially complied with the case plan by obtaining a dual-diagnosis assessment, but failed to follow through with treatment and was unsuccessfully discharged from the first mental health agency at which she treated. Mother then disappeared for over a year. When mother reestablished contact with LCCS in April 2017, Monroe-Wells told mother that mother needed to address her mental health issues before LCCS would allow her to see the children. Mother completed a second dual-diagnosis assessment four months later— receiving nearly identical diagnoses—but again failed to follow through with treatment. LCCS reinstated mother's visits after she obtained her second assessment, but again suspended visits approximately two months later when mother threatened to "whoop" one of the children, accosted the children's foster parent, and threatened to kill the foster parent. Additionally, mother was in a relationship that caused the court "grave concern" because of the allegations of domestic violence that the boyfriend had perpetrated against mother.

**{¶ 33}** As to (E)(2), the court found that mother's mental health issues were so severe that she would be unable to provide an adequate permanent home for the children within one year of the hearing. Mother has struggled with mental health issues since she

13.

was approximately 10 years old, but failed during the course of this case to attend treatment appointments or take her prescribed medicines. The court found that "Mother's mental health remains as unstable now as at the beginning of the case."

{¶ 34} As to (E)(4), the court found that the parents demonstrated a lack of commitment to the children by failing to regularly visit or communicate with the children when able to do so. Father last visited the children on July 22, 2016, and did not provide any support for or inquire about the children after that date. Mother stopped visiting the children and contacting LCCS for 14 months, apparently because she was embarrassed by being homeless. The court found that mother's embarrassment did not excuse her failure to visit the children. The court also found that mother's failure to comply with her mental health treatment demonstrated a lack of commitment to the children.

{¶ 35} As to (E)(10), the court found that father legally abandoned the children by failing to visit or contact them for more than 90 days.

{¶ 36} And as to (E)(12), the court found that father was incarcerated and would not be available to care for the children for at least 18 months. Father was serving a sentence of 30 to 120 months on a drug charge.

{¶ 37} The court went on to determine under R.C. 2151.414(D)(1) that it was in the best interest of the children to award permanent custody to LCCS. Specifically, the court found that (1) the children had social and emotional delays that manifested in their behavior, which worsened after visiting with mother; (2) the children's behavior had improved some while living with K.C.; (3) K.C. was meeting the children's needs; (4) the

14.

children were bonded with K.C.; (5) the children were too young to express a preference about their living situation; (6) the children had been in LCCS's custody for 12 or more months of a consecutive 22-month period; and (7) awarding LCCS permanent custody would provide the children with a safe, stable, and permanent environment and a legally-secure placement that could only be obtained by granting LCCS permanent custody.

{¶ 38} After considering all of the evidence and making its findings, the trial court awarded permanent custody of the children to LCCS and terminated mother's and father's parental rights.

{¶ 39} Both parents appeal the trial court's decision. Mother sets forth a single assignment of error:

> The decision granting custody of the minor children to Lucas County Children Services was against the manifest weight of the evidence.

{¶ 40} In his appeal, father raises two assignments of error:

> A. The Trial Court erred in awarding permanent custody to Appellee when Appellant was not afforded effective assistance of counsel.

> B. The Trial Court committed reversible error in finding permanent custody was in the best interest of the minor children when such a finding was against the manifest weight of the evidence.

## II. Law and Analysis

{¶ 41} Both parents argue that the trial court's decision was against the manifest weight of the evidence. In her assignment of error, mother claims that LCCS did not

15.

clearly and convincingly prove that she failed to remedy the conditions causing the removal of the children from her home, that her mental health makes her unable to provide an adequate home, or that she demonstrated a lack of commitment to the children. And in his second assignment of error, father asserts that LCCS did not clearly and convincingly prove that he legally abandoned the children or that it was in the children's best interest to award permanent custody to LCCS. In response to both parents, LCCS argues that the record contains "more than sufficient" clear and convincing evidence to support the trial court's decision.

{¶ 42} Additionally, father argues in his first assignment of error that he received ineffective assistance of counsel because his trial attorney failed to have him conveyed from prison in Michigan for the permanent custody hearing or to arrange for father to present testimony by "deposition, affidavit, or video or telephone conferencing." Father contends that counsel's actions prejudiced him by preventing him from testifying about contact he had with the children or informing the court about relatives he preferred to have custody of the children. LCCS counters that trial counsel effectively presented father's opposition to LCCS obtaining permanent custody. Moreover, LCCS contends, father was not prejudiced because the juvenile court could not convey father from Michigan, and father's lengthy prison term shows that the outcome of the hearing would not have changed, regardless of trial counsel's actions.

16.

## A. Law of Permanent Custody

{¶ 43} Revised Code 2151.414 provides the analysis that a juvenile court must undertake when considering whether to terminate parental rights and vest permanent custody in a children services agency. Under that provision, the court must first find that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(e) exists. Subsection (a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent; subsection (b) requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; subsection (d) requires a finding that the child has been in the temporary custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period; and subsection (e) requires a finding that the child or another child the parent had custody of has been adjudicated abused, neglected, or dependent on three separate occasions.

{¶ 44} If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.,* 6th Dist. Lucas No. L-10-1053, 2010-

17.

Ohio-3329, ¶ 42-43. If the court finds that at least one factor in R.C. 2151.414(E) applies, it must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1).

{¶ 45} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14.

{¶ 46} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But while we review the evidence and consider the witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'"

18.

(Internal citations omitted.) *In re C.P.,* 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

### B. The Trial Court's Decision is Supported by the Evidence

{¶ 47} Because mother's assignment of error and father's second assignment of error are related, we address them together. Both parents allege that portions of the trial court's decision are against the manifest weight of the evidence. We disagree.

### 1. R.C. 2151.414(E) Findings

{¶ 48} Mother and father each challenge the trial court's findings under R.C. 2151.414(E). Mother argues that the court's findings under (E)(1), (2), and (4) are not supported by the manifest weight of the evidence. Father argues that the court's findings under (E)(10) are not supported by the manifest weight of the evidence. Notably, however, father does not challenge the trial court's findings under (E)(1), (4), or (12).

{¶ 49} In this case, the trial court found that R.C. 2151.414(B)(1)(a) applies, so it examined the R.C. 2151.414(E) factors. "[A] court need only find one factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent * * *." *In re Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, ¶ 38; *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 50, citing *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus.

{¶ 50} As relevant here, the court found that R.C. 2151.414(E)(1), (2), (4), (10), and (12) were applicable to the parents:

19.

(1)  Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2)  Chronic mental illness [or] chronic emotional illness * * * of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *;

* * *

(4)  The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(10) The parent has abandoned the child.

\* \* \*

(12)  The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.

### i.  Father

{¶ 51} Father argues that the trial court's determination that he abandoned the children is against the manifest weight of the evidence.  LCCS counters that it presented sufficient evidence to raise the presumption that father abandoned the children, and father did not present any evidence to rebut the presumption.

{¶ 52} Under R.C. 2151.011(C), a child is considered abandoned when "the parents of the child have failed to visit or maintain contact with the child for more than ninety days, *regardless of whether the parents resume contact with the child after that period of ninety days*."  (Emphasis added.)  The statute creates a rebuttable presumption of abandonment.  *In re A.A.*, 6th Dist. Lucas No. L-17-1162, 2017-Ohio-8705, ¶ 29.

{¶ 53} Father points to the GAL's testimony that he called the children while he was incarcerated to show that he contacted the children in the 90 days before the permanent custody hearing.  But the record also shows that father had no visits or contact with the children between July 2016 and March 2018—far more than the 90 days required to raise the presumption of abandonment.  And R.C. 2151.011(C) specifically

21.

states that a parent reinitiating contact with his children does not negate the parent's earlier abandonment of the children. Further, we find that father's single phone call to the children approximately two months before the permanent custody hearing is insufficient to rebut the presumption that he abandoned the children. Thus, the trial court's finding under (E)(12) is supported by the evidence.

{¶ 54} Moreover, the trial court only needed to find that one factor in R.C. 2151.414(E) applied to father. It found that four factors apply, and father does not challenge the other three findings.

### ii. Mother

{¶ 55} Mother argues that the trial court's determinations that she failed to remedy the concerns that prompted LCCS to remove the children from her home, her chronic mental illness makes her unable to provide an adequate home for the children, and she demonstrated a lack of commitment to the children are against the manifest weight of the evidence. LCCS responds that it presented sufficient evidence to support the trial court's findings and that the trial court only needed to make findings under one subsection of R.C. 2151.414(E) before awarding permanent custody to the agency.

{¶ 56} Mother first argues that she remedied the conditions that caused LCCS to remove the children. She claims that the evidence shows that she was not using drugs because her only positive drug screen was the first one she took, which was positive for marijuana—not meth or heroin. She also claims that she had housing at the time of the hearing. Monroe-Wells confirmed that mother had housing, but said that she had not

22.

seen the inside of the home. According to the referrals that LCCS received, drug use and housing were two of the issues leading to the removal of the children, but they were not the only ones. LCCS also cited in its complaint the long history of domestic violence between mother and father and G.P. having a hand-shaped red mark on his face. LCCS learned of mother's prior mental health diagnosis—for which mother was not receiving treatment—during a family staffing three days after LCCS received referrals about the family. To address these concerns, LCCS included dual-diagnosis assessment, parenting assessment, and domestic violence services in mother's case plan.

{¶ 57} The evidence presented at the hearing showed that mother never failed a drug screen after her first one was positive for marijuana, was not referred for drug treatment, and apparently had housing at the time of the hearing (LCCS points out that it was not allowed to enter the home, so it claims that the home's suitability is debatable). But the evidence also showed that mother did not participate in domestic violence services or parenting services because she was unable or unwilling to treat her mental health issues—which Monroe-Wells testified was a prerequisite to mother getting referrals to the other services. So although mother remedied some of the issues that caused the removal of the children from the home, she did not substantially remedy all of the issues. We find, therefore, that the trial court's findings under R.C. 2151.141(E)(1) are supported by the evidence.

{¶ 58} As to mother's mental health, she cites her completion of two mental health assessments and "sporadic" participation in counseling as evidence that her mental health

23.

conditions are not so severe that she is unable to provide the children an adequate home. She also believes that her ability to obtain housing and her consistently negative drug screens show that her mental health would not affect her parenting. Although mother made some improvements in her circumstances, her limited participation in mental health services is insufficient to demonstrate that her mental health issues will not interfere with her ability to parent the children.

{¶ 59} At the hearing, Monroe-Wells testified that mother had mental health concerns dating back to adolescence, she missed counseling and medication management appointments, and she displayed inappropriate anger and agitation that led to LCCS suspending her visits with the children.

{¶ 60} The records from A Renewed Mind that LCCS presented as evidence confirmed Monroe-Wells's testimony and highlighted other concerns. The records show that mother has a history of mental illness that began when she was 10 years old and a history of failing to follow through with mental health treatment. Approximately two months before LCCS suspended mother's visits in December 2017, A Renewed Mind prescribed mother medicine to help manage her mental health, but mother did not comply with the treatment. Nor did she attend two follow-up appointments for medication management.

{¶ 61} When mother returned to A Renewed Mind approximately three months before the permanent custody hearing, she gave different excuses for her noncompliance with her treatment: she told one provider that she did not get the medicine from the

24.

pharmacy and told another provider that she stopped taking the medicine after reacting badly to her first dose. Further, the records show that mother did not have a job and was supporting herself by donating plasma twice a week and that mother's inability to obtain employment was related to her mental health status.

{¶ 62} A parent's inconsistent participation in recommended mental health services is sufficient to support a finding under R.C. 2151.414(E)(2). *See In re Mar.H.*, 6th Dist. Lucas No. L-17-1171, 2018-Ohio-883, ¶ 45. The record shows that mother's participation in her mental health services was—at best—inconsistent and that she stopped participating in services altogether for more than a year. Moreover, there is no evidence that mother has ever engaged in mental health treatment for a prolonged, sustained period or that she can or will successfully manage her mental health conditions within one year after the permanent custody hearing. Accordingly, we find that the trial court's determination under R.C. 2151.141(E)(2) is supported by the evidence.

{¶ 63} Finally, mother argues that the trial court wrongly determined that she demonstrated a lack of commitment to the children. She claims that she "relatively regularly" visited them from August to November 2017 and that LCCS suspended her visits in December 2017 because of her "somewhat misguided" attempt to protect the children from mistreatment in foster care.

{¶ 64} Mother's argument ignores the one-year period during which she completely failed to visit the children or communicate with the children, LCCS, and the GAL. She also ignores the trial court's finding that she demonstrated a lack of

25.

commitment by failing to attend to her mental health needs. Mother's only excuse for not visiting the children was that she was embarrassed by being homeless. She did not attempt to excuse her failure to participate in mental health services beyond telling Monroe-Wells that she felt "like a guinea pig." Like the trial court, we find that mother's homelessness was not an excuse for failing to visit or communicate with the children. And even after mother found housing and reengaged with mental health services, she did not consistently attend her appointments or take her medicine. Based on these facts, we conclude that the trial court's findings under R.C. 2151.414(E)(4) are supported by the evidence.

{¶ 65} Because the trial court's findings under R.C. 2151.414(E) regarding mother are supported by the manifest weight of the evidence, we find that mother's assignment of error is not well-taken.

### 2. Best Interest of the Children

{¶ 66} Finally, father claims that the trial court's best-interest finding is against the manifest weight of the evidence. He argues that the trial court failed to consider all of the factors in R.C. 2151.414(D)(1) before deciding that granting permanent custody to LCCS was in the children's best interest. Specifically, father contends that the trial court did not consider whether a legally secure placement for the children could be achieved without granting permanent custody to the agency. He argues that the trial court erred by failing to discuss why awarding legal custody of the children to K.C. could not achieve a legally-secure placement.

26.

{¶ 67} In making a best-interest determination, R.C. 2151.414(D)(1) requires the court to consider "all relevant factors," including:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 68} Contrary to father's belief, the trial court considered all relevant best-interest factors. As to (D)(1)(a), the court noted that the children were bonded with K.C. and that their behavior had improved since they began living with K.C. It found that K.C. was nurturing to the children and ensured that their medical and emotion needs were

27.

met.  K.C. also facilitated visits between the children and their siblings who are in the custody of another relative.  The court observed that mother threatened to "whoop" G.P. during a visit and that the children's behavioral issues worsened after visiting with mother.

**{¶ 69}** As to (D)(1)(b), the court determined that the children were too young to express their preferences about custody.

**{¶ 70}** Regarding (D)(1)(c), the court noted that the children were in their fourth placement.  At least one of their placements was disrupted because of their behavioral issues.  The court also found that the children had been in LCCS's custody for 12 or more months of a consecutive 22-month period.

**{¶ 71}** The court did not address (D)(1)(e) in its best interest discussion, but it was not required to do so because it did not make findings related to either parent under R.C. 2151.414(E)(7) to (11).

**{¶ 72}** Concerning (D)(1)(d), the court found that the children could only obtain a legally-secure placement through an award of permanent custody to LCCS.  In part, the court based its conclusion on K.C.'s desire to adopt the children.  Additionally, the court specifically found that neither parent could provide a legally-secure placement for the children.  Mother could not because her mental health was unstable, she had been unable to stabilize her mental health, she lacked steady employment, and she failed to visit the children consistently.  And father could not because he was in prison and "will be there for the foreseeable future."

28.

**{¶ 73}** Father contends that the trial court erred by failing to consider awarding legal custody of the children to K.C. He claims that doing so would have provided the children with a legally-secure placement that did not require awarding permanent custody to LCCS. But awarding legal custody to K.C. was not an option available to the trial court because K.C. did not file a motion for legal custody of the children. Under R.C. 2151.353(A)(3), a person who wishes to obtain legal custody of a child must file a written motion for legal custody that includes a signed "statement of understanding for legal custody." The motion is mandatory, and, as a matter of law, a juvenile court cannot award legal custody in the absence of a written motion. *In re J.G.*, 6th Dist. Lucas No. L-17-1311, 2018-Ohio-3981, ¶ 43, 44. Because K.C. did not file a motion for legal custody, the trial court could not award her legal custody of the children. Thus, giving K.C. legal custody was not a legally-secure placement that could be achieved without awarding LCCS permanent custody.

**{¶ 74}** After reviewing the record, we find that LCCS presented clear and convincing evidence that supports the trial court's finding that awarding LCCS permanent custody was in the children's best interest. Accordingly, we find that father's second assignment of error is not well-taken.

### C. Father was not Prejudiced by Trial Counsel's Actions

**{¶ 75}** In his first assignment of error, father argues that his trial counsel was ineffective. LCCS responds that trial counsel effectively presented father's arguments against granting LCCS permanent custody and cross-examined the witnesses.

29.

**{¶ 76}** The test for ineffective assistance of counsel in a parental rights termination proceeding is the same as that used in criminal cases. *In re T.C.*, 6th Dist. Lucas No. L-16-1154, 2016-Ohio-7631, ¶ 30, citing *Jones v. Lucas County Children Servs. Bd.*, 46 Ohio App.3d 85, 86, 546 N.E.2d 471 (6th Dist.1988). To prevail on a claim of ineffective assistance, the appellant must satisfy the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). That is, the appellant must demonstrate that counsel's performance fell below an objective standard of reasonableness and a reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different. *Id.* at 687-688, 694. "'The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *T.C.* at ¶ 30, quoting *Strickland* at 697.

**{¶ 77}** Here, father has failed to show that he was prejudiced by his trial counsel's performance. Assuming that all other requirements of R.C. 2151.414 are met, the juvenile court need only find that one factor under R.C. 2151.414(E) applies before terminating a parent's parental rights. *C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 50. As discussed above, the trial court's findings under R.C. 2151.414(B), (D), and (E) are supported by clear and convincing evidence. Under R.C. 2151.414(E)(12), which the trial court found applied to father, the juvenile court *shall*

30.

grant permanent custody to a children services agency if, at the time of the hearing, the parent is incarcerated and will not be available to parent for at least 18 months.

{¶ 78} The uncontroverted evidence presented at the hearing showed that father is serving a prison sentence of 30 to 120 months. According to the GAL's report, father pleaded guilty to drug charges in Michigan and was sentenced one month before the permanent custody hearing. Even assuming that father is released from prison at the earliest opportunity, the evidence clearly and convincingly shows that he was incarcerated at the time of the hearing and will not be available to care for the children for at least 18 months after the hearing. Nothing that father might have testified to—either in person or by deposition or affidavit—would change the reality of his extended prison sentence and his resulting inability to care for the children. Thus, we conclude that father has failed to show a reasonable probability that the outcome of the hearing would have been different but for counsel's actions. Because father cannot show that he was prejudiced, his claim of ineffective assistance fails. Therefore, we find that father's first assignment of error is not well-taken.

### III. Conclusion

{¶ 79} This court has thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits. We find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. We also find that father did not show that he received ineffective

31.

assistance of counsel because he did not demonstrate that his trial counsel's actions prejudiced him. Mother's and father's assignments of error are without merit.

{¶ 80} Therefore, the May 17, 2018 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Costs of this appeal shall be divided equally between mother and father pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.         _____
JUDGE

Arlene Singer, J.         

_____
Christine E. Mayle, P.J.          JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.