**[Cite as *In re J.K.*, 2024-Ohio-2333.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

In re J.K.

Court of Appeals Nos. WM-24-005

Trial Court Nos. JUV20223075

**DECISION AND JUDGMENT**

Decided: June 18, 2024

* * * * *

Rachael A. Sostoi, for appellee.

Avery C. Demland and Taylor G. Vance, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal from the December 28, 2023, judgment of the Williams County Court of Common Pleas, Juvenile Division, terminating the parental rights of appellant, Je.K., the father of minor child, J.K., and granting permanent custody of the child to appellee, Williams County Department of Job and Family Services ("the agency"). For the reasons that follow, we affirm the judgment.

**{¶ 2}** Father sets forth one assignment of error:

[Father] received ineffective assistance of counsel because [father's]

juvenile court counsel failed to file a bypass motion.

## Background

**{¶ 3}** The child was born in August 2010, to mother, J.L., and father, who were not married. In December 2020, the child was removed from mother's custody by Indiana Child Services and placed with father.

**{¶ 4}** In March 2022, mother pled to and was found guilty of one count of child molestation, a level 3 felony in Indiana, and one count of child exploitation, a level 4 felony. The victims of her offenses were her children. An order prohibits mother from having any contact with the child. Mother will be in prison until December 2031.

### Father - Agency Involvement

### 2022

**{¶ 5}** On August 23, 2022, the agency received a report that alleged father grabbed the child by the neck and pulled his hair, after which the child left the home, upset, and when he returned, it was dark outside and he was locked out of the home because father had left. It was also reported that father used methamphetamines ("meth"), the home was unsanitary, and the child went to neighbors' houses begging for food, as there was no food at the home.

**{¶ 6}** On August 24, 2022, Lacey Laporte, an investigator for the agency, went to father's home and found the child there alone, but he had a phone in case of emergency.

2.

Laporte gave the child a speed letter to give to father, which directed father to contact the agency. Father called the investigator and asked about the report allegations; he admitted he pulled the child's hair.

{¶ 7} On August 30, 2022, Laporte met with father at the home. There were no environmental hazards in the home, and there was food. Father admitted he pulled the child's hair but denied choking him. Father was drug-tested.

{¶ 8} On September 8, 2022, the results of father's drug tested were received by the agency; father tested positive for meth and amph. The next day, the child was "safety planned" out of father's home with Barry, father's friend and landlord, who was willing to keep the child for a day or two. On September 12, the child was safety-planned with father's aunt ("aunt").

{¶ 9} The agency found the allegations in the report were true, in part, and the case was substantiated for physical abuse, neglect and emotional maltreatment.

{¶ 10} On September 20, 2022, father completed an assessment, and it was recommended that he undergo intensive outpatient therapy ("IOP") and individual counseling.

{¶ 11} On September 30, 2022, the agency filed a complaint alleging the child was abused and neglected.

{¶ 12} On October 5, 2022, a guardian ad litem ("GAL") was appointed; she filed four reports throughout the case.

3.

{¶ 13} On October 26, 2022, a case plan meeting was held to review case plan service, with the goal of reunification. Present at the meeting were, inter alia, father and Mindy Edwards, who was the child's guidance counselor at Edon School. Father agreed to the case plan, which included: complete assessments, follow recommendations for mental health, substance abuse treatment and medication management; comply with random drug screens; test negative for all illegal substances; obtain and maintain stable housing and employment; complete parenting education; comply with monthly caseworker visit; and provide the agency with up-dated contact information.

{¶ 14} A hearing was held November 16, 2022, and father was ordered to submit to a drug screen; the screen was negative for all substances.

{¶ 15} On November 30, 2022, the adjudicatory hearing was held, during which the court found probable cause to order father to submit to a drug screen. The screen was positive for meth, amph, ecstasy and alcohol. Father consented to a finding that the child was abused and neglected, and agreed the child should remain in the aunt's temporary custody. The court found the child was abused and neglected, and noted father's drug use was a significant factor.

{¶ 16} On December 29, 2022, the disposition hearing was held. The court ordered, inter alia, that: the child remain in the aunt's temporary custody; the case plan be adopted and followed; and father participate in Family Intervention Court ("FIC") and successfully complete the program. Father agreed to go to FIC and began that same day.

4.

**{¶ 17}** On December 31, 2022, the court reviewed father's participation in FIC and found he was non-compliant.

**2023**

**{¶ 18}** On January 5, 2023, the court conducted its second review of father's participation in FIC, and found he was non-compliant.

**{¶ 19}** On January 6 and 12, 2023, father failed to appear for FIC.

**{¶ 20}** On January 17, 2023, a review hearing was held; father attended. Father was unsuccessfully discharged from FIC because he missed the first two weeks of court; he did not challenge this ruling. Also, temporary custody of the child was officially transferred to the agency, due to the aunt's long stay in Florida.

**{¶ 21}** On March 9, 2023, a motion to show cause was filed for father's failure to comply with his mental health and substance abuse counseling and parenting education under the court-ordered case plan. Father had also failed to set up supervised visits with the child.

**{¶ 22}** On March 29, 2023, a semi-annual review hearing was held, as was a hearing on the motion to show cause. Father did not appear at the hearings. The court ordered the agency to present a permanency plan to the court by the next court date. Also, the court sentenced father to 30 days in jail for contempt but allowed him to purge the contempt by immediately engaging in his case plan services. A bench warrant was issued.

5.

{¶ 23} On April 28, 2023, father's counsel filed a notice with the court advising that father entered an in-patient detox facility on March 30, 2023, and transitioned to a residential program on April 6, 2023,[1] where he was required to stay for 30 days in order to be successfully discharged. No reason was provided to the court as to why father did not appear at the hearings on March 29, 2023.

{¶ 24} On May 4, 2023, father completed a second assessment and was referred for, inter alia, IOP, individual counseling and psychiatric services. He failed to engage in services.

{¶ 25} On June 27, 2023, the court held a nine-month review hearing, which father attended. The agency reported father had made little progress with his case plan services. The court ordered father to report for a drug test after the hearing; father failed to report.

{¶ 26} On August 17, 2023, the agency filed a notice with the court that Shalom Mediation and Counseling Services ("Shalom") terminated father from services due to father's noncompliance.

{¶ 27} On September 5, 2023, the agency filed a motion for a bypass hearing, alleging it believed there were compelling reasons to keep the case open so father could work towards reunification with the child.

{¶ 28} On September 12, 2023, father completed a third assessment, and an increased level of care to residential placement was recommended.

---

[1] Father was unsuccessfully released from the residential program that same day.

6.

{¶ 29} On September 22, 2023, the agency filed a motion for permanent custody of the child.

{¶ 30} On September 26, 2023, the agency orally withdrew its bypass motion.

{¶ 31} On December 4 and 5, 2023, the hearing on the agency's motion for permanent custody was held.

{¶ 32} On December 28, 2023, the court issued its judgment entry terminating mother and father's parental rights and awarding permanent custody of the child to the agency.

{¶ 33} Father appealed.

**Child**

{¶ 34} Before this case was filed, and during the pendency of the case, the child has had significant issues and multiple delinquency complaints filed. Child had lived with mother until her arrest for sexual offenses against her children.

**December 2020**

{¶ 35} The child was removed from mother's custody and placed with father. The child was diagnosed with anxiety and ADHD and was on medication management through his primary physician.

**2022**

{¶ 36} In May 2022, the child was assigned to the court's diversion program, and in September 2022, delinquency charges were filed against the child.

7.

**Aunt's Home**

{¶ 37} On September 12, 2022, the child was safety-planned to aunt's home, and on September 28, 2022, through a delinquency hearing, aunt was named the temporary custodian of the child. Juvenile court retained the child in the diversion program, but in October 2022, a new delinquency complaint, alleging criminal mischief, was filed against the child. When the child was adjudicated delinquent, he was removed from the diversion program and placed on reporting probation.

{¶ 38} Beginning in October 2022, the child attended school regularly at IEC[2] due to his behavioral issues. He had been suspended from his last school because he choked another child and threw things at the bus driver. While at IEC, the child made significant progress with his behavioral issues and had no issues. His grades for the school year were all A's and one B, in gym.

**2023**

**Foster Home**

{¶ 39} On January 17, 2023, father was referred to Shalom so he could register for supervised visitation with the child. At the foster home, the child had behavioral issues, and on February 22, 2023, he called other youths in the home vulgar names, locked a youth out of the home, then choked another youth and threw him to the ground. On March 5, 2023, the child slapped a youth across the face, snapped a youth's laptop in half

---

[2]IEC stands for Independent Education Center, it is a behavioral school.

8.

and chased a youth around outside.  The sheriff was called when the child got violent and punched the siding and windows and pulled on the shutters of the home.  The child was taken to JDC, then released on March 8, 2023, back to the foster home.

{¶ 40} The child told his caseworker, Kelsey Fruchey, that he had not spoken to father much on the phone while in the foster home, as child tried to call but father did not always answer.  The child only had two visits with father - one in May and one in June 2023. The child said the visits were fine, except when he was yelled at by father because he wanted to call and talk with father more often.

{¶ 41} In July 2023, the foster parent took the child to a new medical provider who changed the child's medication; this was without the agency's knowledge or consent.  In July and August 2023, the child's behaviors were significantly worse, and he had a lot of physical aggression towards other youths.

{¶ 42} On August 14, 2023, the child was again taken to JDC because he was defiant and unruly at the foster home.  In late August 2023, the juvenile court ordered that the child immediately be placed at Marsh Foundation ("Marsh"), a residential treatment facility.

**Marsh**

{¶ 43} The child arrived at Marsh on August 30, 2023.  Caseworker Fruchey received four incident reports for the child, on September 4 and 6, 2023, for fighting with other youths, being defiant and breaking a window.  On September 6, 2023, the caseworker was at Marsh completing a visit with the child when she witnessed the child

9.

become violent with a youth, and try to get into another youth's room, by banging on the door when the youth would not open it. The child made suicidal threats, so Fruchey contacted the prosecutor, who had the child's probation officer pick him up at Marsh and transport him to JDC. The child was at JDC from September 6 through 12, 2023.

{¶ 44} A delinquency hearing was held on September 12, 2023; father did not attend. The court again placed the child at Marsh. The court was advised that the child's interactions by phone with father created increased behavioral issues. In an effort to stabilize the child due to his many placements, and his behaviors after talking with father, the court issued a no-contact order between father and child, which was in effect until the Marsh counselor recommended contact between father and child.

{¶ 45} On October 6, 2023, the child was involved in a fist fight with another youth, so he was removed from Marsh and taken to JDC. The delinquency hearing was held on October 10, 2023; father did not attend. The child was held at JDC from October 6 through November 15, 2023, during which time, his medication was changed and there was a noticeable improvement in the child's demeanor, attitude and conduct.

**Group Home**

{¶ 46} On November 15, 2023, the child was placed in a group home, where he did well. He had one minor incident, but he was able to calm himself down very quickly.

### Hearing on Agency's Motion for Permanent Custody

{¶ 47} On December 4 and 5, 2023, the hearing on the agency's motion was held. On the first day of the hearing, the agency, GAL and father joined in a request that the

10.

court conduct an in-camera interview of the child. The court granted the motion, arranged for and conducted the interview with the child; the GAL was present. The court found the child had the capacity to understand the pending case, and he had the maturity to express his wishes, which were consistent with the GAL's recommendations.

**Caseworker Kelsey Fruchey**

{¶ 48} In addition to the background information above, Fruchey testified as follows. She worked as an agency ongoing caseworker and was the child's only caseworker.

{¶ 49} Fruchey explained that when the child was safety-planned, it meant father agreed to place the child in someone else's care while father worked on his case plan goals.

**2022**

{¶ 50} In October, the child completed an assessment at the Center for Child and Family Advocacy ("CAF") for counseling.

{¶ 51} On November 15, the child was placed in a foster home.

{¶ 52} In December, the agency sent out two requests to the state of Indiana for potential family placements for the child. One request was for mother's sister and the other request was for the child's sister. Mother's sister screened positive for amph, meth, cocaine, heroin, morphine, and fentanyl; that request was denied. The child's sister, who was 18 years old, was not able to take the child.

11.

{¶ 53} The agency was unable to contact father in January or February, so Fruchey was unable to let father know that the child was in a foster home. The child continued with services through CAF, including medication management. In the beginning, the child had minimal behavior issues, but on March 4, he went to JDC due to a delinquency matter. Thereafter, the child was released back to the foster home.

{¶ 54} In mid-May, the agency sent out a request to the state of Indiana for an uncle's potential placement for the child. The uncle had reached out to the agency requesting that the child be placed with him. Uncle was drug-tested and was positive for cocaine. Uncle also had an extensive criminal history, so the request was denied.

{¶ 55} On July 13, the agency received notice from Shalom that father was terminated from services. Fruchey tried to send another referral to Shalom at the end of July, but Shalom said father was terminated from all services and would not be allowed at Shalom.

{¶ 56} When the child was placed at Marsh, on August 30, he did not want to be there and did not want to stay. Fruchey had conversations with him about giving Marsh a chance, but he did not like change, so it took him a little while to adjust. The child attended school on site at Marsh, he had access to a counselor 24/7, and he resided there. His attitude got better, but he still did not want to be there.

{¶ 57} At the time of the December hearing, the child was on juvenile probation. He was in and out of court due to his physical aggression.

12.

**Case Plan Goals**

*PRC*

{¶ 58} Father complied with the goal to complete applications for PRC funding.[3] Father sought PRC money for his electric bill, which was over $3,000, and for car repairs. PRC was only available if the parent was involved in case plan services. Father was not, so he requests were denied.

*Employment*

{¶ 59} Father did not comply with the goal to maintain stable employment, although he said he had several jobs during the case: in December 2022, he reported he worked for a tool company in Indiana; December 29, 2022, he was unemployed but said he had multiple job offers and he planned to start working at Taco Bell, in Ohio; in January and March 2023, he was unemployed; in May 2023, he said he worked at a restaurant in Indiana; and in August 2023, he reported he was employed at a gas station in Edon, Ohio. Fruchey was not able to verify any of father's jobs, except for the gas station. Father was not employed at the time of the hearing.

*Meetings*

{¶ 60} Father did not complete the goal to meet with an agency worker at least once a month to monitor his progress. The following shows when an agency worker

---

[3] PRC paid for visitations, parenting classes and other services. Without a completed application, the parent had to self-pay for the services.

13.

successfully met with father or attempted to meet with him but was unsuccessful:

Successful visits in 2022:

August 30 and September 13 and 19, home visits; October 26, visit at juvenile probation after Fruchey was alerted that father was there; and November 9, agency visit;

Successful visits in 2023:

March 3, home visit; May 4, agency visit; September 13, agency visit; and November 27, visit at Team.

Unsuccessful visits in 2022:

October 6, 11, 17 and 21; November 7, 15 and 18; December 6, 13 and 15;

Unsuccessful visits in 2023:

January 3, 20 and 27; February 3, 7 and 15; early March; April 6, 13 and 18; May 16 and 25; June 2, 14 and 16; July 18, 25 and 28; August 3, 4 and 11; September 18; October 20; and November 11.

{¶ 61} On October 20, 24 and 26, Fruchey attempted to locate father by phone, email and social media, but was unsuccessful.

{¶ 62} On October 26, 2023, Midwest informed Fruchey father was at the facility.

{¶ 63} On October 30, 2023, Fruchey attempted to contact father at Midwest but was unsuccessful.

{¶ 64} On November 17, 2023, Fruchey spoke with father on his cellphone.

14.

**{¶ 65}** Fruchey had a total of five meetings with father - three at the agency and two at his house. It was not normal for her to have only two home visits in a case filed over one year ago. She completed visits with father at the agency, "because he would show up [there]." All of Fruchey's attempted visits were at father's home. She also spoke with father on and off throughout the case, but he did not proactively reach out to her.

*FIC*

**{¶ 66}** Father did not meet his case plan goal of successfully completing FIC.

*Parenting Education Classes*

**{¶ 67}** Father failed to successfully complete parenting classes.

*Drug Screens*

**{¶ 68}** Father did not complete his case plan goal of taking random drug screens and producing negative results. Fruchey was shown a report, admitted into evidence, from Forensic Fluids Laboratories to the agency of father's drug screen results, and testified to the following:

> 2022
>
> August 30 - positive for amph, meth and THC;
>
> September 8, October 26 and November 10 - positive for amph and meth;
>
> September 13, November 9, 16 and 18 - negative for all substances;
>
> 2023
>
> January 6, March 3, August 8 and September 21 - positive for meth and amph;

May 4 - negative for all substances.

*Mental Health and Substance Abuse Treatments*

**{¶ 69}** Father did not complete the case plan goal to follow recommendations for mental health, substance abuse treatment and medication management. See the testimony of Alexis Sinn, father and Jeffrey Miller, below.

## The Child

**{¶ 70}** Throughout the case, Fruchey saw the child at least three times a month. When the case began, the child shared that father pulled his hair and put his hands around the child's neck, but did not squeeze or choke the child.

**{¶ 71}** When the child was at the foster home, the other foster children had visits with their parents, so the child was very curious why he was not permitted to have visits or regular phone calls with father. The child finally visited with father in May and June 2023, and after the visits, the child had behavioral issues, especially after the June visit. Father left early from the June visit, and that evening, the child's behavior at the foster home was very disruptive - he punched things in the home, kicked the outside of the home, and tried to rip the shutters off the house.

**{¶ 72}** At the group home, the child had access to a counselor 24/7, and started seeing another counselor, who he liked. He will be enrolled into Leap schooling in Toledo but can transition into public school if he has no behavioral issues at Leap for at least two months. The child was signed up and had a caseworker at OhioRise, which provided case management services. The child was eligible for $1,500 to purchase items

16.

linked to a mental health service, and since he used music as a coping mechanism, OhioRise bought him an MP3 player and headphones, which he used to calm down if he felt angry.

{¶ 73} The group home was very large and had an indoor pool, a movie theater room, an X-box room and the child has his own room. He rode his bike or the electric scooters and enjoyed going grocery shopping with the group home leaders to pick out his own snacks. There were seven other boys in the home, the child was the youngest and he had no issues with any of the other boys, as they all seemed to get along very well. The older boys kind of took the child under their wings, as they all went through similar situations, so the child bonded with them over that.

{¶ 74} Since the child was placed in the group home on November 15, 2023, he did not ask to see father or talk to him. Father was not aware of where the child was placed until November 27, 2023, when Fruchey was able to complete a home visit with father, and up-dated father on where the child had been living for over a year.

{¶ 75} The child communicated by phone with his sister, and the calls went very well. He enjoyed talking to his sister. They did not talk about anything upsetting or triggering to him. There were no concerns with the phone calls, and the calls were supervised.

{¶ 76} At the time of the hearing, the child did not wish to have a relationship with father, because the child was just tired of being disappointed. The child wanted to reside with his aunt, but he understood that was not an option at this point. However, the child

17.

visited his aunt and spent Thanksgiving with her at her home. The child was comfortable at the group home, liked it and was doing very well. The people at the group home thought he was a great kid and were hopeful he could remain there for as long as he needed; it could be a long-term placement for the child.

{¶ 77} If the agency was granted permanent custody of the child, he would stay at the group home, and be transferred to an adoption case worker. The child would remain at the group home unless adopted. Fruchey did not believe that either parent was an appropriate placement for the child.

**Counselor Alexis Sinn**

{¶ 78} Sinn testified she was a dual diagnosis counselor at Recovery Services of Northwest Ohio ("Recovery"), working in both mental health and substance use diagnosis and care.

{¶ 79} In September 2022, Sinn completed an assessment with father; mental health counseling and substance use counseling IOP were recommended. Father attended three IOP groups (on November 23, December 5 and 6, 2022), and three individual sessions (on September 28, November 22 and December 12, 2022). He cancelled or failed to appear for numerous appointments. Sinn explained IOP group at Recovery meets three times per week for three months, and individual counseling sessions are weekly.

{¶ 80} On January 23, 2023, father was unsuccessfully discharged from Recovery due to his failure to engage.

18.

**{¶ 81}** On May 4, 2023, an updated assessment was completed for father and individual therapy, medication service, case management service and IOP were recommended. Sinn noted father's participation or lack thereof at Recovery during 2023:

Individual counseling - no-show or cancelled: May 10, 15, June 1, July 13, August 1, 21, 28 and 31;

IOP group - no-show or cancelled: May 11, 15, 17, 18, 22, 24, 25, 30, 31, June 1, August 7 and 9;

Attended individual sessions on May 15 and August 2:

Kept appointments with physician service on May 25 and August 29;

No-show/cancelled with physician service on August 1 and 22;

Urinalysis screens completed on August 2, 3 and 8;

No-show for urinalysis screen on August 22; and,

Attended psychiatric evaluation on August 8.

**{¶ 82}** On September 12, 2023, another updated assessment was completed for father, and residential level of care and medicated assisted treatment were recommended.

**{¶ 83}** On September 27, 2023, father attended his last session at Recovery, and was subsequently discharged from Recovery.

**GAL Kylee Towne, Esquire**

**{¶ 84}** Towne testified she was the child's GAL throughout the pendency of this case, and she spoke with numerous people involved with the case. She was not able to observe the parents interact with the child, and the court relieved her of this duty.

19.

*Father*

{¶ 85} Towne attempted a home visit at father's house, but father was not there and the lady who answered the door would not let Towne into the house. It was very difficult for Towne to speak with the lady, as the lady was mistrustful of Towne and her co-worker. Father called Towne later and said he was not in a relationship with the lady, she was just a very good friend. Towne did not reschedule the home visit because father did not know when he would be home, as "he was kind of going back and forth between this job he was looking at, he didn't have reliable transportation. Then he was staying in Angola for a little while, there was some conversation about him trying to reach out to another son that he has . . . so there was [sic] just some other underlying things that [father] was working through[.]"

{¶ 86} Towne observed that at the beginning of the case, father could not understand why the child was removed, why the agency was involved or why there was a case plan. Father felt he was being singled out or picked on. More recently, Towne thought that father had grown a lot and took some accountability for his part in the situation.

{¶ 87} Towne noted that father had many opportunities for treatment, counseling and FIC, he understood the case plan and what he needed to do to get the child back, but he had a pattern of getting clean for a little while, then falling back into his addiction and making excuses. Towne believed father prioritized things above his counseling or

20.

staying clean. Towne thought it was just recently that father decided he wanted help and took his services seriously.

{¶ 88} Towne was concerned that when father was discharged from Midwest in late November 2023, things did not end well, as Midwest tried to reach father and he failed to respond. Towne noted that father indicated there was no lapse in treatment between Midwest and Team, but she was not able to confirm this. Towne appreciated that father liked Team better, but she thought he needed continuity of care, rather than transitioning from one facility to another.

{¶ 89} Another concern was father's relationship with the child. Towne noted while the child lived with aunt, he was in contact with father, but the contact was not always appropriate, and sometimes there would be escalated behaviors from the child. Towne recalled at the beginning of this case, father had some issues with discipline and felt he was sometimes inconsistent in his discipline of the child, which would result in more outbursts and more behaviors. As the case progressed, there was a lack of contact between father and child, so family counseling was needed, but first father and child needed to be in a place to participate in individual counseling. Towne thought the child needed to work through his trauma so he could open up and be more receptive to reunification counseling with father, as the child had a lot of anger towards father. In addition, father needed to complete parenting classes.

21.

**{¶ 90}** Towne's office tried to reach out to father many times, but he hardly responded. Towne's last contact with father was in late November 2023, and prior to that, she spoke to him in June 2023.

*Child*

**{¶ 91}** Towne observed the child at aunt's house and the foster home, and talked with him while he was at JDC. Towne witnessed a lot of growth in the child during her time as GAL, but also a lot of regression. When the case started, the child was 12, and was a typical teenage boy in many ways, but his trauma impacted his daily life, and his strained relationships with his parents were difficult for him.

**{¶ 92}** Towne believed the child was very frustrated because he felt father chose drugs over him and he did not think father would get help. Towne believed the child and father previously had a bond, but it was now significantly strained. The child thought the case was still going on due to father's failure to follow through with what he needed to do to make progress in the case plan, so the child blamed father for the situation.

**{¶ 93}** The child had been angry and had outbursts, but he was using coping skills to properly manage those. In the last month or so, after a medication switch, there was a remarkable improvement in the child's outbursts and his ability to articulate, instead of reacting impulsively.

22.

*Permanent Custody - Wishes and Opinions*

{¶ 94} The child expressed his wishes to Towne, which were that he would rather live at a stranger's house than ever be placed with mother again. When asked about father, the child kind of chuckled and said father was not going to be in a position to have him anytime soon. The child was very clear that he never wanted to speak to mother again and did not want contact with father at this time.

{¶ 95} Towne believed the child needed a legally secured permanent placement because drugs have been an ongoing issue with father, and although father started treatment in October, due to the level, nature and amount of time of his drug use, he needed to have a longer period of sobriety. Father also needed to leave treatment, which he said would be in March 2024, and transition into the community to do IOP.

{¶ 96} Towne testified that five family placements were explored, but none were suitable. The child's sister recently expressed interest again in having the child placed with her. Towne observed, however, that sister was very young at 19, she did not own or rent a home, and she lived with her ex-stepmom. Towne did not know if the sister's ex-stepmother was an appropriate place for the child.

{¶ 97} If the child were placed with father at this time, Towne believed the child's anger outburst would increase, and he would have a very strong reaction, not a positive one.

{¶ 98} Towne opined the child could not be placed with either parent within a reasonable time of the hearing, the parents showed an unwillingness to provide an

23.

adequate permanent home for the child, the parents failed to substantially remedy the conditions which caused the child's removal, despite the agency's efforts to assist father to remedy the problems which caused the child's removal.

{¶ 99} Towne observed that now that father has made progress with his drug use, it has been very difficult from the child's perspective, because "he's faced with the fact that dad[']s finally starting to try, and it's really scary to hold on to hope for what that might look like. . . . [The child] struggles with the unknown anyways, and so will dad get it together? . . . Or will dad be back to how it was?"

{¶ 100} Towne observed that when you are the child's age of 13, "you don't have the ability to conceptualize the future, everything is right now, the impact that it has on him is right now. . . . A year to him is a lifetime, he doesn't have the ability to think through future and what even tomorrow could bring." Towne opined if the case would be left open to continue on, it would "really impact[] [the child], and what he is even able to think of for the future."

{¶ 101} Towne opined if permanent custody of the child was awarded to the agency, "this will allow for [the child] to stop getting his hopes up, and to stop being disappointed and to know that this is his future, and here's the path forward." Towne further opined "at this time [father's] needs are so starkly different from what [the child] needs that I don't believe there is the ability to reunify. . . [or] that would be in [the child's] best interest."

24.

{¶ 102} Towne further opined that it was in the child's best interest for both parents to have their parental rights terminated, and for the agency to be granted permanent custody of the child.

**Counselor Jana Richards**

{¶ 103} Richards testified she worked at Shalom as a counselor, she has her LPC license, and she used to supervise visitations. She first met father at parenting education classes when he was referred by probation.

{¶ 104} Both individual and group parenting classes were offered at Shalom, which focused on love, affection, discipline, relationships, dating and making good choices in friends. Classes were held weekly, for one hour, and had to be done in succession, as classes built on each other. If three or more classes were missed, the parent must restart the program. To complete the program, a parent must typically attend 10 classes.

{¶ 105} Father attended five individual classes, in August and September 2022, and was very engaged and forthcoming about his interactions with the child. However, father cancelled or did not show for many classes, so he did not complete the program.

{¶ 106} Father was referred for parenting classes by the agency, and had to start over. He was given ample opportunities to complete his classes, but he either cancelled or did not show a total of 11 times. He never attended classes, so he did not complete the program.

25.

{¶ 107} Father was also referred, in January 2023, to Shalom for supervised visits with the child.  To start the process, the parent must complete orientation paperwork, then go into Shalom with the GAL to sign forms.  Father eventually completed orientation, after he cancelled a few times.  Two supervised visits were held between father and the child on May 13 and June 9, 2023.  Father cancelled or did not show up to three visits scheduled for May 30, June 28 and July 12, 2023.

{¶ 108} On July 13, 2023, Richardson authored a termination of services note to father, due to his multiple cancellations and no-shows.

**Juvenile Court Diversion Officer Gary Mohre**

{¶ 109} Mohre testified he was employed by juvenile court as a diversion officer, and was familiar with the child, who had been on diversion for about four months.  At that time, the child lived with father, father always brought the child in for appointments, and it seemed to Mohre that father interacted pretty well with the child.  The child then had some incidents at school, which led to probation, so John Karacson took over as the child's supervising officer.  On August 24, 2023, while the child was on probation, Mohre received the following voicemail:

This is [father], can you give me a call please. . . .I'd like to talk to you because I can't talk to John, quite honestly I think he's an asshole. You can tell he's a full[-]blown fucking alcoholic just by his fucking skin tone and his face.  He's a complete asshole when he tries to talk to me.  And then I'm paying child support and I'm not even on the approval list to see my

26.

son, and I get humiliated in court yesterday, cause she asked me if I got anything to say and I say no because no one will fucking listen to me from the beginning why do they want to listen to me now. They got [the child] on like five . . . different medications, he was on two . . . before he went to my [aunt's] originally. Now they have him on . . . [one medicine] . . .which can have the opposite affect and make you have suicidal thoughts and shit, which he had. You know I tried to say something from the very beginning but on one wanted to listen to me and all the allegations from child services were false, but I took the fucking drug screen, and the drug screen come back bad, and I told them upfront about everything, it was right after my dad died. You know they came a couple weeks ago, tested me, right after a year of my dad's one year, I was alone, yeah I fucked up. But other than that I did pretty fucking good and I ain't touched a bottle or nothing in almost five . . . months since rehab, and I'm pretty damn proud of myself. I've had one mistake but if that's all they got on me as a parent, they need to give me my kid back. But anyway I'm paying child support and everything else, and I didn't even know I could go visit my son, so I looked stupid in court yesterday, cause nobody told me. Um, I told them and child services about him wanting to commit suicide because I was on the phone with him. And, uh, with the foster lady one day she just sat there on the phone and didn't say shit. Then I call [sic] and leave Kelsey a message to

tell her all these things and she called me back . . . days later after [the child's] already in jail for trying to walk out in front of a car, like I'm not the problem. Um, I want some help, some actual help, someone that actually gonna work with me to get my fucking son home, because child services is overwhelmed. Kelsey's workload so full she don't [sic], they don't even hardly come to my house. I sit there every single day, all day long before I go to work. I still have a job five . . . months, I'm still kicking some ass, I'm making a lot of headway at talking to my other son from my ex-wife from Fort Wayne, I'm taking care of my warrants, I went to court, like I need help to get my damn kid home and at least interact with him so I can try and save him before he's institutionalized. Starting to talk like a thug, trying to stand up for himself, because he's being bullied in there, and their [sic] threatening to kill him.

{¶ 110} Mohre called father and told him the message was inappropriate; father apologized and said he also needed to apologize to Karacson.

**Mother**

{¶ 111} Mother testified that she had full custody of the child when he was removed from her home on December 2, 2020. Prior to that, she said the child had only seen father since July 2020, due to father's drug abuse. Mother testified that father was granted custody of the child in March 2022, and before that, she believed the child was a

28.

ward of the state of Indiana. She said it was not in the child's best interest to reunify with father.

{¶ 112} Mother consented to the termination of her parental rights, and to a finding of permanent custody to the agency, as she said it was in the child's best interest.

**Father**

**Direct Examination**

{¶ 113} Father testified that he had full custody of the child until 2019ish. He explained he was in a motorcycle accident in 2016 or 2017, had eight months of therapy to learn how to walk again, got divorced, and in 2019, the child was with mother for a year. In 2020, father lived at a home in Edon, Ohio, in 2020, which was owned by landlords "who [father had] a contract with." He received a called to pick up the child, "and they told me what happened and I fell to my knees and then I had to deal with child services with Indiana for two . . . years."

> Father described his bond with the child before the child was removed in 2022 as really tight, like when I had full custody of him when I was married, cause I had full custody of him at three [years old], you know hired a [GAL], went and got married in Mexico, came back, and the [GAL] sided with me then, and . . . I had custody of him all throughout . . . [The child] would come to the house in women's clothes . . . I took him to all his neurological stuff, all his appointments, sleep studies, and if he had any problems in school, the school would call me, and then I would talk to him on the phone, calm him

29.

down, and then he would either go back to class or he would go to the principal's office and hang out there the rest of the day. Um, he was doing really well actually, and I tried to keep him with [a doctor] . . . and those medicines cause [that doctor had] been with him his whole life, but they didn't accept Ohio Medicaid obviously in Indiana, and I couldn't afford the medicine. Um, I was trying to find a psych doctor here but that's not something you can just call up and get, um, so some things, when this all started it was actually kind of beneficial, some of the help I got, I needed. But Mindy [the guidance counselor at Edon school] . . . bought him shoes, uh got him a coat, helped us with food, stuff like that, because I lost my job, cause I had to go get [the child] from school one day, because he was bad again, and he got arrested and we went and picked him up from when he originally got arrested, and he said they sat on him and held him down and he was kicking and screaming so he got charged with uh disorderly conduct . . . And I told them . . . he doesn't like to be touched . . . So I mean it's been a difficult process, transition. And Edon wouldn't let him go to public school because of all his stuff in Indiana so he had to go to IEC and he hated it. And when [the child] doesn't like something, he's difficult. . . [H]e's discouraged by me right now, so he's not real happy right now.

{¶ 114} In 2022, when the agency became involved, father admitted to the investigator that he "had a problem from opioids from [the] motorcycle accident." Father

said the child "stated there was no abuse." Father said he was employed at that time "in AJ."

{¶ 115} Upon receiving the results of father's drug test, the agency told father the child had to be removed from the home as the "test came back [positive]," which he "figured it would." Father was "surprised with how . . . they did it. It was just immediate." He knew he "was going to be behind the eight … ball on that because [he] didn't really have anybody, and [his] family on [his] dad's side is mostly old, and [his] mom don't even want - [his] sister and her kids living there, let alone [father's]" Father "called Barry, [he] got Barry to take him um for a weekend, and then he went to [aunt's.]"

{¶ 116} In March of 2023, father entered in-patient at Midwest Recovery ("Midwest") but was "kind of being pushed in a way because Berry and Lacey [the landlords] were fed up and I was maybe going to lose my house . . . so I agreed to go." He left Midwest early, after 25 or 26 days, because he missed his fiancée. Leaving, however, "was just a huge mistake because I made everything worse. The only good thing I did was got a job, paid some bills, got my taxes done so I don't get in trouble . . . then come to find out . . . those were a mess because my ex-wife claimed [the child] an extra year and she shouldn't have and she forged my name[.]"

{¶ 117} Father further chronicled his struggles:

I . . . found out . . . that he was abused, it really messed me up, especially if

you knew all the details. . . [T]hen last July . . . 25th, I was ejected from my

31.

car and broke five . . . ribs, fractured my neck, I was in the hospital for a week in intensive care, and then my dad came home a week and a half later, he died. And then they took my son after that . . . my drug screens were dirty so. . . I felt like I was living my life through [the child], like cause you know my son was abused, I was abused, the same way when I was a kid[.]

**{¶ 118}** Father explained that it was difficult for the agency and providers to contact him, and he missed appointments because

I just didn't do a very good job, um I cancelled a lot, um uh sometimes that stuff over the phone, I live right by the grain bins in Edon so the reception's not the best, but a lot of times, I'd get everyone's voicemails the next day, you know my phone would restart or cause it would just shut off by itself, it's a government phone, it's a free phone. . . I knew I needed the help, I just, when you're in active addiction, I mean you don't . . . want to do a whole lot . . . I was embarrassed by what I was doing, I didn't want to lose [the child] but I didn't know how to get him back either. Kind of felt like the deck was stacked. . . . I went a period without a vehicle until my whole family got together and chipped in money and got me a vehicle, and then there was a time where the starter went out, and it was just money pit, the truck that I bought, we just ended up putting a crap ton of money in it. Um, sometimes things just didn't work out too for . . . no excuses[,] just general reason. . . . I think we - in my honest opinion looking back on it all now,

obviously it's my fault for most of it, but I think we both [he and the agency] could have done a better job.

{¶ 119} On October 8, 2023, father tried to take his own life by taking pills, but he woke up the next day and decided to "go to rehab and get it right." Father said he allowed a family stay at his house in October 2023, while he was gone.

{¶ 120} Father went to Arrowhead and detoxed "with nothing.. . . [and] found out that there was Fentanyl in the meth, which really upset me. I took that personal cause I died once." After detoxing, father had to get Medicaid before Midwest would accept him, so he called the agency and was provided with emergency Medicaid for 90 days. He went to the residential program "that day, um, at Midwest, finally got a certificate. It's the first time I ever gotten one, never finished anything I started. So that was a big deal for me." At residential, "they . . . take your phone. . . So that's why I wasn't able to return any of the calls that were talked about earlier in October cause I didn't have my phone."

{¶ 121} After 30 days, which was mid-November 2023, father left residential and went to Midwest's housing program, but he "just didn't like the set up, the program at all . . . it was only three . . . hours a day." Father left and went to Team Recovery ("Team") for in-patient treatment. He had been in recovery for 56 days, his mindset changed, as well as

[w]hat I want, and what I don't want, and what I don't want to lose. Um, I had to realize that holding all these resentments in my own childhood and

33.

my own stuff that I went through in my life was only making things worse so not taking accountability for it was not only making my life worse, but watching [the child] be fine too is really getting to me, and bothering me that I wasn't there for him like I should have been, and . . . I'm sitting down whining about not having a dad, but yet [the child] don't have his dad. . . . I've also been able to accept the fact that my father[']s gone and he's not going to be able to hold my hand no more and I got to grow up. . . I mean my dad was my best friend.  If anything went wrong, I'd just call him.  I mean hell I can't even get my own mom to take my kid, you know, but yet she wants to live in my house . . . All I ever had in my life was my dad.

{¶ 122} Father said he was in phase two of Team's program; he was in PHP[4] and went to group sessions and classes like anger management, self-love and financial stress. If you missed two groups or failed a drug screen, you got kicked out.  He was drug screened Monday, Wednesday, Friday and a random day, and "get[s] breathalyzed." During the week, father had free time after 3:00 p.m., so he could get at a job, but he did not have one; he said he applied for jobs.  Father shared he was doing great, he was where he needed to be, and it was the best decision he ever made.

{¶ 123} Father said he took accountability for his actions and did not want to lose rights to his son right in the middle of trying to better his life.  Father explained that

---

[4] There is no indication in the record what PHP means, however our research shows it could stand for partial hospitalization program.

34.

drugs have never been a part of my life until . . . after my motorcycle accident, and it's not the life . . . I want to live and I'm really trying to be done. . . . I'm on the sublocade shot which you get once a month, it's in my belly. Um, you know I can go the bathroom for you anytime you want a drug screen[.] . . . I just wish I got it right the first time, but it don't work that way cause I lost more than just [the child]. I mean I lost a lot of stuff, my life, I'm not talking material stuff, I'm talking people, family, this is my last chance . . . with my immediate family on my dad's side. Sucks when someone won't even let you in your own home and it's your family.

**{¶ 124}** Father testified he received both mental health and substance abuse counseling at Team and will graduate from the program in March 2024. He said he was offered a job at Team, so he had to get his COCA, stay sober for at least five months, and go to meetings at least twice a week. He was also working on getting a sponsor so he could do the twelve-step program. Father did not take parenting classes at Team, but he said he was "getting enrolled in them. . . getting information on them," and for two months he will get paid "up to. . . $350 just to show up and go to the classes and that sort of thing, you get Walmart cards, all kinds of stuff."

**Cross-Examination**

**{¶ 125}** Father was asked if he said he bought a house, and he responded, "Uh, we started land contract, and then I didn't have the credit to buy it so I'm just renting it." He was also asked how he was paying for the apartment and he said, "Um, my-actually I

35.

have some um, I was good until I left, and Barry said that, to make sure I got this one right and make it count, so everything's good so far." Later father testified that the utilities were on in his house because a cousin paid $1,600 on the electric bill. Father said he had a water bill, but he thought the people who stayed at the house in October 2023, paid it.

{¶ 126} Father was asked if he dealt with CPS for two years through Indiana, and he replied, "Yes. . . We got tested, she actually drove to my house, um she[5] rent a car and came to my house and I had to deal with them for two years, we all did, all three of us dads. . . .[The child], his sister, and his youngest brother who then was two." Because of mother, "[w]e all had to be . . . monitored by child service even though we didn't do anything. We all had to test once a month. . . Anything they asked, we had to do."

{¶ 127} When asked about his testimony that he was not surprised at the results of the agency's drug screen, father stated, "Oh, no I was honest about everything upfront. I told her that-I told her everything about my motorcycle accident and everything. She even told Barry and my aunt that I was more honest than I had to be."

{¶ 128} Father was questioned about the speed letters that caseworker Fruchey left on his door, and he admitted he received most of them, "[b]ut I let her know a lot of times when I had been working these last several months though from May that [sic] I probably be in Auburn [sic] and I gave the address at [ex-fiancée's] house too, and she said that if

---

[5] There is no indication in the record who "she" is.

36.

she had to, she could try there. [sic]  Cause after work I always went to [ex-fiancée's], stayed and went home in the morning.

{¶ 129} Father was asked if his ex-fiancée was on the case plan; he did not think so.  He was then asked, "So Ms. Fruchey would have no specific need to go see [ex-fiancée]?" and father replied, "No, I just sort of sent back I'm there.  I was trying to do that so she'd know, if I wasn't home, that's where I'd be.  If she wanted to test me or do a visit or whatever.  That's the whole purpose of why I gave her address."

{¶ 130} Father said he did not always call the caseworker when he received her letters, although he had the agency's contact information and knew the caseworker was required to see him monthly.  Father was asked what he meant when he testified that both he and the agency could have done a better job, and he stated,

> Well I think, I mean, I, there were sometimes where I was very upfront
>
> with information, like maybe going to Auburn, I gave [ex-fiancée's] phone
>
> number even in case they couldn't get ahold of me, um, yeah I wasn't
>
> always trying to run or hide. . . . Kelsey was out doing home visits
>
> somewhere, and I called the office . . . and her, um, partner or whatever
>
> answered the phone . . . and . . . I asked about the, uh, uh, shit what did I
>
> ask about, uh, um, I asked about something, oh I was telling her that I asked
>
> about visits at Shalom, because the Shalom lady . . . texted me back and
>
> said "I don't know, I'll have to talk to your case worker."  And I never
>
> heard anything back from her, and then I asked Kelsey about it, and she

said they put the referral back in, but they hadn't heard anything back yet. So I think maybe the lines got a little messed up there between all that, but that's more so what I was referring to.

{¶ 131} Father was questioned about not visiting with the child from January to May 2023, and he said it was due to his drug use and

[c]ause [aunt] wouldn't let me come over if I was using or anything of that. She had to know for sure that I was clean or I couldn't even be on the property. She doesn't mess around.[6] She took care of me when I was around [the child's] age for a summer because I kept running away from home and everything cause of my dad. He was mean. . . . My dad was abusive in my childhood, so there-I want to take parenting classes and do some of this other stuff that I signed up for personally, for me because I don't want to do things the way my dad did, because you can't do things like that now.

{¶ 132} Father was asked about what occurred in the hallway of the courthouse after a delinquency hearing, and he said, "Yeah, he was, I could have been more professional, I was kind of acting like how my dad would've me, but um yeah it was-it was wrong."

---

[6] January to May 2023, the child was in a foster home, not in aunt's home.

{¶ 133} When asked if he started to turn things around when he went to detox in October 2023, father replied,

> Yeah, cause [ex-fiancée] cut me out of her life completely. She came and got the car she bought me, I was paying for and everything, just done. And that, that hit me pretty hard. . . And then just [the child] and going here and going there. . . the day I went to that appointment [at Marsh,] I didn't know I had a protective order, and I got there, and he's got a bloody hand and he's telling me to hurry up and he wants to get in the car and me to take off . . . [H]e said he put his hand through a window. Then I calmed him down and they thanked me for that, then I talked to them for a minute, then I left cause I didn't want to get arrested. I had no idea until I drove an hour and I made the appointment . . . days before I even went . . . cause [the child] wanted to see me so he kept calling me.

{¶ 134} Father was asked about his warrants and he explained there was a warrant in Auburn "for missing court, or for um shoplifting charge at Walmart actually [from December 2022,] . . . cause I was in treatment, so I didn't go to the court date, they were aware of that, I already talked to them on the phone, so um, I went there, I sat in the jail cell deal for a couple hours till they took all my information." He said after he was released from jail, he went to Fort Wayne where there was a body attachment to ensure that he would appear at court for child support for his other son, Ja. Father said he had

39.

joint custody of nine-year old Ja. and talked to Ja. on the phone, "that's it, and [Ja.'s mom is] fully aware of where I'm at and what I'm doing because I don't lie to her."

{¶ 135} Father said he cleared up the warrant in probably June or July 2023, "[c]ause my sister called the cops in Auburn and told them I was at [ex-fiancée's]." After father left his ex-fiancee's house one day, "15 minutes later, [the police were] searching [her] house, cause . . . there was a tip that I was there. My sister will try to do anything she can to railroad me."

{¶ 136} Father was questioned about a warrant that was issued in November 2023, and he said it "would be from the same thing because I missed the court date, yeah. Um Midwest faxed everything to them though, so as far as I know I don't."

{¶ 137} When asked he attended the child's recent delinquency hearings, father responded, "I wasn't able to get to the last one because I was in treatment, but I'm pretty sure I've made all the rest of them, all but one."

{¶ 138} Father was asked if he knew where the child was placed, and he replied that "Kelsey said it's pretty close to where I'm at, it's in Swanton and they got a lot of cool stuff, and he's doing pretty good."

{¶ 139} Father was asked if he provided names for placement of the child, he said,

I talked to my mom, that was it, I knew I was wasting my breath[], and my sister['s] not an option because she's done nothing but try to sabotage it the whole time anyway. Like on the voice message, the reason I had to take care of-my uncle volunteered to help me take care of my warrants was

40.

because my sister called me a facebook message to the agency [sic] and said they needed to look my name up in Indiana and see I had more and some blah blah blah blah blah. . . I don't know what my sister's mindset has been but she's totally went off on her own little way since my dad's passed.

{¶ 140} Father was asked about his testimony that his mom wanted to move into his house, and he responded, "She's divorced . . . [s]he doesn't want to live there anymore and my sister's still there with her three kids, and she wants to stay in my house but yet she's had nothing to do with my life, ever really."

{¶ 141} Father said he has been clean for 56 days, and "I haven't drank since April [2023], but drugs . . . 56 days is all. Alcohol since April."

**Court Inquiry**

{¶ 142} Father was asked what his diagnosis was for mental health counseling, and he responded, "[t]hey said I have PTSD and I have anxiety, and some kind of depression . . . But nothing I can't fix with counseling, because it mainly sterns from my childhood, just like [the child's]. We have a lot of the same things that happened to us."

{¶ 143} Father started treating with a counselor, Tim, at Team on November 27, 2023. Father said "Judge Wagner comes once a month to . . . help you get your license, or birth certificates, or fines that need paid, stuff like that. They have all kinds of stuff that they offer to help you."

{¶ 144} Father was asked if he paid his child support order for the child, and he replied,

41.

I don't think they ended up taking any out, when I was at Midwest we did ask for it to be put on hold because I was in treatment, but I do know that I turned it in and I also told the lady on the phone, urn, because they had my old phone number. So, I actually called them for the court date that day I was scheduled for court for that, and we got it done, and I gave them all the information they needed for Phil's [gas station where father had worked], so I don't know. I believe I had a piece of mail before I left too that said I was behind like three hundred . . . bucks and they were going to hold my income tax or something but I don't know why they weren't taking it out.

**Case Manager Jeff Miller**

{¶ 145} Miller testified he was father's case manager at Team, and he counseled father. Miller said father was in phase one of treatment, he was in PHP along with mental health groups, which were held four days a week. Father was housed in a Team facility, a separate entity from the outpatient center, where children were allowed to visit. Miller saw father every day, and father was drug-tested at least three times a week. Father could sign up for groups, which were appropriate to address his problems.

{¶ 146} Miller testified father "got to use on November [17], um from what I understand he was unhappy" with the housing and treatment at Midwest, so he was picked up and driven to Team's facility. Father was at Team for three weeks, he put the work in, and he was compliant as far as urine screens and group attendance. Miller noticed father was a lot more alert now than he was when he arrived at the center.

42.

**Juvenile Probation Officer John Karacson**

{¶ 147} Karacson testified he was employed by the juvenile court. In June 2022, the child was placed on diversion, and Karacson was the diversion officer at that time. When Karacson initially met with father and child, they were cussing at each other, back and forth. Karacson testified that father could work on interactions with the child through parent project and parenting classes.

{¶ 148} While the child was on diversion, Karacson had limited contact with father. Yet, Karacson ensured that father took the child to appointments with Shalom. Karacson also referred father for parent project, but it was challenging trying to get father enrolled. Karacson worked with the child through August or September 2022, at which time the child was transitioned to Officer Mohre because Karacson became a probation officer.

{¶ 149} In December 2022, the child was placed on probation, so Karacson became his probation officer. As a probation officer, he gave his cell number to families, so they could contact him at all times, he conducted home, office, school and detention visits with juveniles, he drove juveniles to appointments, and he was required to meet with juveniles once a month. Karacson met with the child much more often than once a month, because it was a tough case, and he had lunch with the child a couple of times.

{¶ 150} After the child was placed in the agency's temporary custody, Karacson had very limited contact with father, as Karacson focused his attention on the child's

43.

custodian, to provide assistance.  Yet, father came into Karacson's office to talk and seek advise.

{¶ 151} The last time that Karacson saw father and child was in September or October 2023, in the hallway after court; there was a lot of cursing between the two, which was loud, so the whole courthouse could hear.  Karacson believed the child, who was already angry, heard testimony that father was not following through with his case plan and was continuing to use drugs, which set the child off.  Father had been given opportunities to work on his interactions with the child, but he failed to do so.

{¶ 152} Karacson opined that father said the right things but did not do the right things.  Father still had a lot of work to do, even though over a year passed since the case was filed.  Karacson knew that father lost his dad, but the child needeed stability and while father got better and there was an obligation to protect the child.

### Permanent Custody Law

{¶ 153} A juvenile court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence.  *In re A.H.*, 2011-Ohio-4857, ¶ 11 (6th Dist.).  "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."  *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).  Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]."

44.

*Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988). Thus, a judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, syllabus (1978).

{¶ 154} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, two statutory prongs: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d); and (2) the child's best interest is served by granting permanent custody to the agency. *In re A.H.* at ¶ 12; R.C. 2151.353(A)(4). Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, paragraph three of the syllabus (1954).

{¶ 155} As to the first prong, R.C. 2151.414(B)(1)(a) provides that "the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent." When making a finding under R.C. 2151.414(B)(1)(a), the court must find, by clear and convincing evidence, that only one of the factors enumerated in R.C. 2151.414(E) exists. *In re A.H.* at ¶ 15. Here, the court found R.C. 2151.414(E)(1), (2), (4), (7) and (12) applied, and those factors are:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to

be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic . . . chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section . . . ;

. . .

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

. . .

(7) The parent has been convicted of or pleaded guilty to one of the following:

. . .

(d) An offense under section . . . 2907.04, . . . of the Revised Code or under an existing or former law of . . . any other state, . . . and the victim of the offense is the child[.]

. . .

(12) The parent is incarcerated at the time of the filing of the motion for permanent custody . . . of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody[.]

{¶ 156} As to the second prong, the best interest of the child, when making this determination, R.C. 2151.414(D)(1) provides that the court "shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child . . .;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . .;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 157} Here, the court found that R.C. 2151.414(E)(7) applied.

### Juvenile Court Decision

{¶ 158} On December 28, 2023, the court issued its judgment entry in which it granted the agency's motion for permanent custody of the child. In addition to the foregoing testimony, the court made the following findings of fact and conclusion of law, by clear convincing evidence.

{¶ 159} Father submitted to drug screens, but not regularly for unannounced screens. He refused to submit to a screen on September 13, 2023; he told the caseworker it would be positive. There were no screens for father for: December 2022; February 2023; April 2023; June 2023; July 2023; October 2023 and November 2023, despite three attempts per month by the agency. This was contrary to the case plan and screening process. Father was non-compliant with the drug screen case plan requirement.

{¶ 160} Father failed to provide updated contact information to the agency, and at times at court hearings, he provided excuses as to why the agency could not locate him, and he often stated that he was waiting for them at his house. Father's testimony was not substantiated by the evidence.

48.

{¶ 161} Father testified he had a rental home and his landlord was supporting him in his sobriety. The landlord did not testify so the court was uncertain as to the truth of father's housing situation.

{¶ 162} The only witness presented on behalf of father was father, with no supporting verification of his testimony. Based upon the testimony presented, the court found father was not a credible witness.

{¶ 163} As part of the court-ordered case plan, father was to have monthly visits with the caseworker. Agency workers had been inside of father's home one time when the initial investigation was held and two other times, in March and August 2023. Father did not permit the agency in his home monthly, as required, and he did not permit the GAL into his home at any time during this case.

{¶ 164} Father failed to make any progress on case plan requirements which would have put him in a position to reunify with the child. The court noted father's significant drug abuse history, warrants and failure to appear for court hearings.

{¶ 165} Father had lied and been dishonest since the start of the proceedings, he failed to engage with the child, or even inquire about the child's care and well-being.

{¶ 166} Beginning in December 2022 and continuing throughout this case, the agency contacted many relatives and possible kinship placements for the child, and the options for placement have been exhausted.

{¶ 167} The court found the GAL complied with Sup.R. 48, and the court placed significant weight on her recommendations as she conducted an independent

49.

investigation and provided the court with information regarding the child. The GAL testified and recommended it was in the child's best interest to have the parents' parental rights terminated and to place the child into the custody of the agency. The court found the GAL's recommendations were in the best interest of the child.

**First Prong of Permanent Custody Analysis**

{¶ 168} The court found, by clear and convincing evidence, that R.C. 2151.414(B)(1)(a) applied, that the child cannot or should not be placed with either parent within a reasonable time. The court relied on R.C. 2151.414(E)(1), (2), (4), (7) and (12).

{¶ 169} The court further found the conditions which caused the child's removal from father's home were drug use by the father and physical abuse allegations between father and child. Father's continued drug use was not remedied, and parenting education was not completed to remedy the physical abuse issues. The agency made diligent efforts to assist father to remedy these issues over the past year and provided a substantial amount of resources to father. Father presented no verifiable evidence that he will remain in treatment, that he will be successful in treating his addiction, that he will stay sober or that he is capable of parenting the child absent the use of physical force and abuse.

{¶ 170} The court found father showed a lack of commitment to the child by repeatedly failing and at times refusing to engage in substance abuse treatment and other requirements of the case plan, including parenting classes, and the court further found

50.

each parent demonstrated a lack of commitment toward the child by showing an unwillingness to provide an adequate permanent home for the child.

{¶ 171} The court found mother was incarcerated at Rockville Correctional facility with the earliest release date being December 21, 2031. She was serving a sentence for convictions of felony child exploitation and felony child molestation.

**Second Prong of Permanent Custody Analysis**

{¶ 172} As to the child's best interest, the court considered the relevant factors in R.C. 2151.414(D)(1)(a) through (e) in reaching its determination.

{¶ 173} The court determined the child had the maturity to express his wishes, which were aligned with the GAL's recommendations, the child had been out of his home since May 2022, the agency exhausted all placement options, father had not visited the child since June 2023, and the child needed stability and certainty as he matured.

{¶ 174} The court found in considering all the best interest factors that, by clear and convincing evidence as presented at the hearing, the child cannot and should not be placed with either parent within a reasonable time, due to the facts presented, and it was in the best interest of the child that a grant of permanent custody be made to the agency.

## Father's Assignment of Error

{¶ 175} Father argues he received ineffective assistance of counsel due to his trial counsel's failure to file a bypass motion with the juvenile court. Father notes "[u]pon arriving at the annual review . . . [ hearing,] there was a bypass motion filed by the Agency to allow [him] to continue working the case plan to reunify with [the child]," but

51.

the motion was orally withdrawn by the agency because the motion for permanent custody was filed.

{¶ 176} Father argues "[u]pon motion by any party, not just by motion of the Agency, the court may grant a six[-]month extension of agency temporary custody. Juv. Rule 14.[7] O.R.C. § 2151.415(D)(1)[, which] . . . is also called a bypass."

{¶ 177} Father further argues that but for counsel's error, the outcome of the case would have been different, as "[w]ithout the bypass motion . . . the Court was only considering whether to grant permanent custody of [the child] to the Agency and whether to terminate [father's] parental rights." Father contends if a bypass motion had been filed, "the Court could have allowed [him] to continue working the case plan since he was taking steps towards recovery by being at Toledo Recovery[8] since November 27, 2023, and he was still in treatment at the time the final hearings occurred." Father submits he was "also taking classes to help improve himself and his parenting while he was in Toledo Recovery. Id. [sic] [He] had struggled for a long time to seek help continuously for his substance abuse, but he had been making substantial progress, and a

---

[7] We note father's reference to Juv.R. 14, does not comply with Sixth Dist.Loc.R. 10(C), which states in pertinent part that "legal authorities . . . must include . . . the . . . **paragraph number where the point of law is found**." (Emphasis added.) Juv.R. 14 contains three paragraphs. It is the burden of father, not this court, to demonstrate his assigned error with arguments that are supported by citations to legal authorities. *Speller v. Toledo Pub. Schools Bd. of Edn.*, 2017-Ohio-7994, ¶ 56 (6th Dist.). Nevertheless, we will search through Juv.R. 14 to determine if there is support for father's contention.

[8] There is no reference to or evidence of Toledo Recovery in the record.

52.

bypass motion would have created a reasonable probability that the outcome would have been different and permanent custody may not have been awarded to the Agency at that time."

## Standard of Review

{¶ 178} To establish ineffective assistance of counsel in a parental rights termination case, the parent must prove the same elements as those in criminal cases. *See In re G.P.*, 2018-Ohio-4584, ¶ 76 (6th Dist.), and *In re J.R.*, 2023-Ohio-1920, ¶ 39 (6th Dist.). Appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 2002-Ohio-350.

## Law

{¶ 179} R.C. 2151.415(D)(1) states, in relevant part, "[i]f an **agency** . . . requests the court to grant an extension of temporary custody for a period of up to six months, the **agency** shall include in the motion an explanation[.]" (Emphasis added.)

{¶ 180} Juv.R. 14 provides, in relevant part:

(C) Modification. The court, upon its own **motion or that of any party**, shall conduct a hearing with notice to all parties to determine **whether any order issued should be modified or terminated**, or whether any other

53.

dispositional order set forth in division (A) should be issued. The court shall so modify or terminate any order in accordance with the best interest of the child.

### Analysis

{¶ 181} Upon review, we find that R.C. 2151.415(D)(1) does not state that a parent may file a request for an extension of temporary custody. *See Matter of A.B.*, 2023-Ohio-2679, ¶ 40 (5th Dist.), citing *In the Matter of T.G.*, 2022-Ohio-1213, ¶ 68, (5th Dist.), citing *In re A.C.B.*, 2017-Ohio-4127, ¶ 34 (11th Dist.). We also find that Juv.R. 14(C) may allow a parent to file a motion to extend temporary custody of a child.

{¶ 182} If a six-month extension were granted, father asserts a reasonable probability exists that the result of the juvenile court proceedings would have been different.

{¶ 183} Father argues that he struggled for a long time to seek help continuously for his substance abuse. The evidence in the record supports father's argument. When father was drug-screened on August 30, 2022, he tested positive for meth and amph, and throughout this case he constantly tested positive for drugs. Although he was afforded numerous opportunities to participate in substance abuse treatment, father consistently failed to engage in services or was unsuccessfully discharged from services. Then, shortly after the agency filed its motion for permanent custody of the child, and two months before the hearing, father again engaged in drug treatment services.

54.

{¶ 184} Meanwhile, the child was in and out of multiple placements and schools, had ups and downs with his behaviors, and experienced disappointment after disappointment due to father's actions and inactions. The child was offered many services during this case to assist him with his trauma and behaviors, and he had a team of people to help and guide him, including aunt, caseworker Fruchey, GAL Towne, therapists, diversion officer Mohre, probation officer Karacsons, group home leaders, and more recently, his sister. The child had lived in a group home for about six weeks before the permanent custody hearing, where he seemed comfortable and happy and was well-liked. Long-term placement for the child was available at the group home.

{¶ 185} At the hearing, GAL Towne recommended that the parents' parental rights be terminated, and the child be placed into agency's custody, as that was in the child's best interest. The child agreed with the GAL, as he did not want a relationship with father at that time. Caseworker Fruchey opined that neither parent was an appropriate placement for the child.

{¶ 186} The juvenile court, in its comprehensive, well-reasoned decision found that father was not a credible witness at the hearing, he failed to make any progress on his case plan requirements, he was dishonest since the start of the case, he failed to visit with the child or even inquire about the child's care and well-being. The court placed significant weight on the GAL's recommendations, and found the child had the maturity to express his wishes, which were consistent with those of the GAL. The court found it was in the child's best interest for custody to be awarded to the agency.

55.

## Conclusion

**{¶ 187}** In light of the foregoing, we conclude father failed to show that a reasonable probability exists that the decision of the juvenile court regarding the permanent custody motion would have been different, such that after six months, the court would have found that it was in the child's best interest to reunify with father. Father has not demonstrated that his trial counsel was ineffective by not filing a bypass motion. Accordingly, father's assignment of error is not well-taken.

**{¶ 188}** On consideration whereof, the judgment of the Williams County Court of Common Pleas, Juvenile Division, is affirmed. Father is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.            _____

                                                         JUDGE

Christine E. Mayle, J.          

                             _____

Myron C. Duhart, J.                                      JUDGE
CONCUR.

                             _____

                                                            JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.